PETITIONS OF NEW ENGLAND TEL. & TEL. CO.,

RE INCREASED RATES.

(80 A2d 671)

February Term, 1951.

Present: SHERBURNE, C. J., JEFFORDS, CLEARY, ADAMS, JJ., and HUGHES, Supr. J.

Opinion Filed May 1, 1951.

*John D. Carbine, Guy M. Page* and *Charles Ryan* (of Boston, Mass. bar) for the telephone company.

*Clifton G. Parker,* Attorney General, for the State of Vermont.

*Arthur L. Graves* for the Public.

SHERBURNE, C. J. These are appeals from separate orders of the public service commission upon three revised rate schedules filed by the New England Telephone and Telegraph Company, and come here upon exceptions. The first rate schedule was filed October 30, 1947 to take effect on December 1, 1947, and the order thereon is

dated April 24, 1950. The second rate schedule was filed on November 15, 1948, to take effect on January 1, 1949. The third rate schedule was filed on September 8, 1949, during the proceedings before the commission on the second rate schedule, to take effect on November 1, 1949, and was designed to increase the rates upon about 1700 stations in Vermont served by central offices in adjoining states, which had not been affected by the two prior rate schedules. The orders upon the two last rate schedules are each dated April 18, 1950. After the filing of each rate schedule more than five persons adversely affected applied to the commission praying that the commission investigate the matter and make such order in the premises as justice and law required. The rates in the first two schedules went into effect under bonds in accordance with V. S. 47, § 9376. The prior proceedings before the commission upon the first rate schedule were before us in *Petition of New England Tel. & Tel. Co.*, 115 Vt 494, 66 A2d 135, hereafter sometimes referred to as the former case. The State has excepted to all three orders, and the company has excepted to the orders upon the last two rate schedules. Because of the numerous questions presented we have adopted the unusual procedure of dividing the writing of the opinion between two Justices in order to expedite the disposition thereof. My part of the opinion deals with the company's exceptions, and Mr. Justice Jeffords has written the part concerning the State's exceptions.

## RATE BASE

The findings show a large amount of property under construction upon which the company has charged interest, which is capitalized and ultimately enters the plant account when the plant is actually put into service. It thus becomes a part of the rate base and the Company is entitled to earn a fair rate of return on such interest as long as the particular item of plant remains in service. The present plant in service includes interest charged during construction. It is the accounting practice of the company to credit the interest charged to construction in its revenue accounts. The commission concluded that to include such plant in the rate base and permit the company to charge interest during construction, which it capitalizes, would result in a double return, and consequently excluded such plant from the rate base. To this the company excepted. We held in the former case, 115 Vt 494, 505, that such property should not be so included if the inclusion would result in a double return be-

cause interest upon the unfinished construction had been capitalized by the Company. A similar finding was sustained in *Petition of Central Vermont Public Service Corp.*, 116 Vt 206, 215, 71 A2d 576. The company admits that if it did not credit interest during the test year there would be a double return, and insists that by its inclusion there is no duplication. The company charges interest at 5% on plant under construction, which presumably is ample as that is the rate it charges. It expects to get considerably more than 5% on its rate base. If we assume that this latter return is 5.5%, the figure arrived at by the commission, and that the company's theory were approved, it would get a return of 5.5% upon plant under construction plus 5.5% upon the 5% interest charged to construction. This exception is not sustained.

The company excepted to the exclusion from the rate base of the cost of certain lands purchased as proposed sites for future central offices. We quote from the findings:

> "We recognize the desirability of encouraging public service corporations to be farsighted as to the needs of future service where such property may be acquired at a saving in cost. However, we regard it as being inequitable and unfair to look to the public exclusively to underwrite such advance purchases thus 'guaranteeing the utility against all mistakes.' Barnes, Economics of Public Utility Regulation, 425.

> "The accepted test as to the allowance of this item is 'whether the time for using the property in question is so near that it may properly be held to have the quality of working capital.' *Re Petition of New England Tel. & Tel. Co., supra* at 505, 506.

> "The principal items in this account consist of property owned by the company situated in Brattleboro, Montpelier and Rutland. The record indicates that the company originally anticipated that the property located in Montpelier would be put into service in 1948; Rutland, 1947 and Brattleboro in 1947. These dates have come and long passed and the property has not yet been devoted to public service. These dates have been progressively advanced to the point where current estimates for Rutland indicate that the property there may be put in use in 1952; Montpelier,

1955; Brattleboro, 1953. If the plans relative to these particular pieces of property were definite in the first instance, their constant·revision has established the character of the plans at the present time to be highly indefinite. Between the present time and the anticipated future use of the property, many factors might intervene which would require the abandonment of the particular site for constructing central office exchanges in the various communities indicated which might render highly imprudent the utilization of the property so acquired. Further, the Commission could not with reason justify the conclusion that such property held for future use in 1955 has the character of working capital in 1949. Obviously the company would not with prudence acquire materials and supplies in 1947 for use in 1955. Further, we take judicial notice of the fact that the property included in this account was acquired at or near the peak of real estate prices in the post-war era. We regard this risk as one that management undertook which should be assumed by the investor rather than the consuming public.

"We also note that in this account, the petitioner has included property which is located in the Town of Putney, Vermont acquired October 18, 1939—more than a decade ago. It is inconceivable in our judgment that the interests of the consumer will be fairly served by including property which has not come into actual public service for a period of ten years or more.

"None of the items included in this account are scheduled for public service in 1949 or 1950. The expected arrival of the time for such utility is too remote to give the subject property the character of working capital. We therefore exclude it from the rate base. *Columbus Gas & Fuel Co.* v. *Pub. Util. Com. of Ohio,* 292 US 398, 406, 54 S Ct 763, 78 L Ed 1327, 1332, 91 ALR 1403."

We stated the law upon this subject in the former case, at pages 505, 506, as follows:

"Several rules are followed in dealing with the ques-

tion of property held for future use. Barnes, The Economics of Public Utility Regulation, p. 425. The one most generally adopted, and the one which appeals to us, recognizes that business judgment must be employed to anticipate future needs and that this judgment may not be arbitrarily interfered with. The test generally applied by these cases is whether the time for using the property in question is so near that it may properly be held to have the quality of working capital. *Columbus Gas & Fuel Co.* v. *P. U. Com.*, *supra; State ex rel. Pac. T. & T. Co.* v. *D.P.S.*, 19 Wash 2d 200, 142 P 2d 498; *State* v. *Tri-State Tel. & Tel. Co.*, 204 Minn 516, 284 NW 294; *Pac. Tel. & Tel. Co.* v. *Whitcomb,* 12 F 2d 279; *Denver Union Stock Yard Co.* v. *U. S.,* 57 F 2d 735.

"There is no merit to the claim of the company that property held for future use should be included in the rate base as a matter of law. This question, like the preceding one, is one of fact to be determined by the commission. In making this determination it should consider whether the purchase of the property in question was made in pursuance of honest and reasonable business judgment in carrying out some definite plan, for example, or whether the expenditure was dishonest, wasteful or imprudent. The time within which it may reasonably be expected that the property will be used is, as we have indicated, very important in determining the question. * * *"

The correctness of the commission's action must depend upon whether the facts recited support its conclusion of remoteness, and whether that in itself is sufficient to justify exclusion. The company's brief states:

"Obviously the question relates to '1949 and the future' and the fact that the property was purchased in 1947* by itself is irrelevant. It is true that because of financial difficulties the original dates of use had to be postponed, but the record is clear that unless such difficulties continue there are definite plans for use of

---

* Putney land was purchased in 1939—cost $500 and expenses.

the properties. However, the fact that unforeseen conditions may intervene is irrelevant. The important question is whether it is prudent in 1949 'and the future' to have acquired land for use in 1953 and 1955. The Commission made no finding as to how long before the service dates the buildings must be planned and specifications drawn. Obviously, before equipment can be installed the building must be completed; before a building can be completed it must be planned and planned for a particular site. That some care must be taken in selecting a site is apparent for several reasons. All circuits in an exchange must be brought to a central office. It is obvious that a central office location cannot be too far from a business center, otherwise the cost of carrying all of the circuits to the office would be exorbitant. The location of the present office with reference to a proposed site is important for the same reason. Consequently, when it is apparent that an office is going to be replaced, it is certainly prudent to find the site well ahead of time.

"The Commission did not find that in any of these places, locations that would not require more outside plant construction than those now held, are available or will be available in the future. The effect of its arbitrarily saying that the time is too remote is to discourage prudent planning, and the Commission's action was erroneous.

"Further, as stated above with reference to Property Under Construction, the effect of the exclusion was to deprive the Company of its cost of money prudently invested in such property."

■ We agree with the commission that the expected arrival of the time for the use of such property for central station purposes is too remote to give it the character of working capital, and hold that for that reason alone it was properly excluded from the rate base. This exception is not sustained.

■ Barnes, The Economics of Public Utility Regulation on page 425, states as one alternative that property purchased for future use may be excluded from the rate base until it is actually employed in the public service, at which time it may enter the rate base

at its original cost plus the cost of carrying the investment to the date of employment. Along this line, when and if any of the pieces of land is actually employed or about to be employed for central office purposes it may be proper to put it in the rate base at its original cost plus carrying charges, provided that this does not exceed what it would then cost to obtain it. It is to the advantage of the telephone user that the company be foresighted in the purchase of such sites. This rule will allow the company to capitalize the carrying charges, such as maintenance, taxes and interest less income received subject to the above limitation. But until put to public use, or about to be put to public use, such sites should be carried as an independent investment.

The company claims an inconsistency between the commission's findings in the matter of the rate schedules to take effect on December 1, 1947, from which no exception was taken, and the findings in this case, in that for the thirteen month period ending December 31, 1948, it decreased the allowance for depreciation by $69,861, without reducing the company's reserve as of January 1, 1949, by that amount, and that consequently it used a larger reserve, and hence a lower rate base than it should have in this case. We need spend no time upon this. If an inconsistency exists it can be rectified at the new hearing necessitated by the sustaining of other exceptions.

## PENSIONS

This company and the other Bell companies established a noncontributory pension plan in 1913, applicable to all employees after completing a designated period of service. From that time until 1927 it was financed on a pay-as-you-go basis, and pensions were charged to operating expenses. The pension payments under this plan constantly increased as more employees became eligible to pensions, and studies were made in 1926 as to possible methods of meeting the problem. A memo by the comptroller of the American Tel. & Tel. Co. advised the parent company of the increasing past service liability and advised it to take steps to prevent further growth, and recognized the inequity of charging operating expenses for past delinquencies. In 1927 the Uniform System of Accounts was changed at the instigation of the Bell companies to permit charges of pension accruals to operating expenses. On October 1, 1927, the financing of the company's pension plan was placed on a fifteen year service accrual basis. Under this plan pension accruals com-

menced at the beginning of the employee's fifteenth year of service, and the company provided that the amount accrued should be placed in an irrevocable trust fund with a trustee. ·Upon the adoption of this plan the company transferred to the trustee approximately $2,000,000, which had been reserve in the pay-as-you-go pension plan, and which was about twice the amount required to meet the current and future pension payments to employees who had already been retired and were receiving pensions. On January 1, 1929, the company changed from a fifteen year basis to a full service basis. On the bases of these two plans the accruals to the credit of the pension trust fund would not provide for all the costs of expected future pensions, because a large number of employees had been in service prior to October 1, 1927. The deficiency, as of January 1, 1929, amounted to $18,085,263, computed by taking the difference between the present worth of the estimated future pensions under the plan and the total in the fund plus the present worth of future payments into the fund at the full service accrual rate. This amount was termed the unfunded actuarial reserve requirement. The company then recognized the existence of this unfunded actuarial reserve requirement, and left it as a problem for further study and action. Nothing was done about meeting this requirement until 1937, when it had grown to $24,810,689. On April 1, 1937 the company adopted what is known as the "modified remaining cost basis," its present method of dealing with the unfunded actuarial reserve requirement. The then requirement was considered to be fixed or frozen just as though it were a fund on hand, and payments, called freezing payments, were then to be made into the fund each year equal to the income which the unfunded reserve would earn if it were actually available for investment. These freezing payments were necessary to preserve the integrity of the plan and to assure payment of future pensions in full. The 1949 freezing payment, amounting to $21,900 as stated in the commission's report, was disallowed in full.

From 1937 to 1941 the freezing payment was charged to Account 672. This accounting treatment was questioned by the Federal Communications Commission. That Commission in December 1942, issued a report and order requiring its elimination from Account 672, and the company was directed to charge it to Miscellaneous Income Charges, Account 323. Upon appeal this order was affirmed. *New England Tel. & Tel. Co.* v. *United States,* 53

F Supp 400. This proceeding was only a determination of proper accounting treatment and had no ostensible rate-making consequences. We have elaborated somewhat upon the commission's report as to the nature of the pension plan in respects where there is no disagreement, in order to present a more accurate basis for discussing the company's exceptions to the findings upon this question.

The commission recognized that the pension plan was designed to serve the best interests of the employee, the investor, and the telephone subscriber by promoting the efficiency of its employees and eliminating the problem which confronts them arising from superannuation, and that the cost of facing this problem must of necessity be handled by the company in some way consistent with the efficient operation of its business, and that the cost of a fair and reasonable plan constitutes a justifiable business expenditure, and is properly chargeable to current operating expenses.

The commission states in its findings that the plan adopted and put into effect has failed to adequately meet its superannuation problem and has resulted in the unfunded actuarial reserve requirement, and that had the company in 1927 begun to make monthly charges to operating expenses on a proper accrual rate to provide for future pensions, the problem of the unfunded actuarial reserve requirement would not have to be currently faced. It refers to the accounting case of the company against the United States, *supra,* where the court stated that the company having failed in this respect it could not at a later date so load the charges to that account as to make up for the actuarial deficiency resulting from such failure. The commission regarded it as improper to charge the telephone subscribers in 1949 or future periods with the cost of making up the deficiency which should have been exacted from rate payers in the period when the deficiency developed, and states that an allowance of this amount would, in substance, constitute the imposition of retroactive rates. It goes on to state that the record is clear that the company committed an error in judgment, although it may well be that the error was honestly incurred and without wilful intent to project the burden of adequately maintaining the pension plan to rate payers served at a future date. It calls attention to the memo of the comptroller of the American Tel. & Tel. Co. which we have previously mentioned. It states that it feels that a gross inequity would be achieved and an unsound principal of regulation established in the

allowance of this charge as an operating expense, and that payments which would otherwise have been employed in establishing a financially sound pension plan have been paid out to stockholders in the form of dividends, and that the telephone subscriber had no part in the decision as to the plan, nor was it in his power to make a timely correction of a deficiency known to exist. It calls attention to *In Re Village of Lake Placid,* decided by the New York Public Service Commission, 78 PUR (NS) 386, where the New York commission points out a similarity between depreciation reserves and those arising from inadequate provision for pension payments, and calls attention to the rule in the case of inadequate depreciation reserves having been taken in the past. In disallowing the freezing payment the commission determines that the action taken by the company in 1927 was in substance unreasonable, constituting an abuse of discretion by the company's management, which should not be charged to present day telephone users. All of these findings and statements were severally excepted to.

In substance the commission states two reasons for its disallowance of the freezing payment as an operating expense:

1. The company's management made an error in judgment which should be borne by the stockholders rather than by the rate payers.

2. 1949 and future telephone subscribers should not be charged with the cost of making up deficiencies which should have been charged to former subscribers.

The need for proper fundings and adequate provision for past service benefits is now generally recognized, but in 1913, when the Bell companies adopted their pension plans, knowledge of these matters was relatively meager. 64 Harvard Law Review 633, 636. When the company adopted the accrual plan in 1927, the unfunded reserve was not caused by insufficient accruals as the commission suggests. Inasmuch as the actuarial computations are based upon the full service life of the employees, and inasmuch as at the time of the adoption of the accrual method the company was a going concern and had employees with considerable accumulated service life, the accruals, even though accurately computed, will not be so large as they would have been if the plan had been instituted at the inception of the business because of the presence of these veteran employees who would be entitled to full pensions after one or two

years of additional service. The short accruals related to these employees affect not only the accruals themselves but also the earnings which the fund would otherwise have produced.

The unfunded reserve is the inevitable result of the establishment of a pension plan upon an accrual basis by a company at some later date than the first day of the employment of the first employee now in service or entitled to a pension. The cost of such a pension plan can be met in only three ways:

1. By the amount in the fund.
2. By the amounts to be paid in.
3. By earnings on 1 and 2.

When a full service life accrual plan is adopted sometime after the institution of a business, the present value of future payments plus the anticipated earnings thereon is less than the present value of the future pensions. The difference between the cost and the income and the earnings thereon is the unfunded actuarial reserve requirement.

Prior to 1927 only amounts actually paid out for pensions could be charged to operating expenses. Under the Uniform System of Accounts there was no mistake of management in adopting a pension plan on a pay-as-you-go basis. Nor upon the change in the Uniform System of Accounts was there any mistake in putting in the fifteen year service accrual basis in 1927, and the full service accrual basis in 1929.

This leaves the question as to whether there was any error in management in not earlier taking action with regard to the unfunded reserve. In 1927 no statistical data were available upon which a sound actuarial program could be based. In 1929 the decision of management was to recognize the unfunded, but to allow it to remain quiescent until there was opportunity for further study. The company says there was no error in this decision and that only three possible courses of conduct were open to it as follows:

1. It could have arrested the growth of the unfunded by a method similar to that later employed. This would have resulted in payments sufficient to freeze the unfunded at $18,085,263 as it existed on January 1, 1929. The plan later adopted freezes the unfunded as it existed in 1927. The taking of this step in 1929 would not have eliminated the necessity for freezing payments. The difference is that it would have started them earlier.

The company says that 1929 was not a propitious time to institute freezing payments because it had developed its pension plan on a step-by-step basis. The first step on the pay-as-you-go basis was at small expense in the early years. The second step on the fifteen year service accrual basis called for substantially larger payments than the first, and the third step on the full service accrual basis resulted in a further immediate annual cost. The company says that management, having taken two steps in 1927 and 1929, both of which resulted in immediate increases in expense, very wisely and prudently decided not to further immediately increase the expense by arresting the growth of the unfunded, but to let that remain for some little time, and that it was the hope of the company officials that the resulting increased expense could be absorbed by it, and that it would not be necessary for it to ask for rate increases at that time.

2. The possibility of funding the unfunded requirement. This would have required the payment of $18,085,263 to the trustee. Such an amount could have been provided only from surplus or borrowings. On December 31, 1927, the company's surplus was only $2,122,488. This was invested in the business. This represented a decrease from $6,780,761 as of December 31, 1922.

3. Recognition of the unfunded and postponement of action until a more propitious time. This was the alternative taken.

The Company says that in 1937 it was faced with the necessity of making a decision if the plan was not ultimately to be defeated. It considered funding, but that was still impossible, and it inaugurated the freezing payment to arrest, but not to amortize, the unfunded.

Relative to the questions discussed and to the commission's views that present telephone subscribers should not be charged with the cost of making up past deficiences we now turn to some of the cases bearing upon these questions. In *State ex rel Pac. Tel & Tel Co.* v. *Department of Public Service, supra,* the opinion states:

> "In the case at bar, it appears that when respondent first set up its pension system, it was operated on a 'pay-as-you-go' plan, and that in 1928, the company changed this system, adopting an accrual plan of payment based upon actuarial tables and studies. Appellant argues that under this system, a charge was imposed upon present rate payers to make up a de-

ficiency in the pension fund which existed prior to 1928, and that the change in plan violated the principle that past losses cannot be recovered from present or future rate payers. Appellant suggests that under the present system, the rate payers are contributing to the existing unfunded actuarial reserve, because many of respondent's employees were so employed prior to 1928, and for the basis of computing their retirement pay, that service is considered.

"Difficulties are always experienced, whether by governmental agencies or private businesses, in setting up new spheres of operation of established governmental agencies or private businesses. If a change is to be made, a new system must have a beginning, and if a system is to be terminated, it must have an end. Save in so far as basic legal principles or definite rights of individuals or groups are violated, the law does not arbitrarily forbid change, nor does it control the future by establishing the past or the present as an immutable mold from which patterns must be taken for future years.

"In connection with the change of system inaugurated by respondent in 1928, we find nothing which places an illegal burden upon present rate payers.

"As Courts have often stated, the officers responsible for the conduct of a business exercise a broad discretion in directing and controlling the operations thereof. In the absence of any showing that such officers have abused their discretion or acted arbitrarily, illegally, or beyond their lawful authority, courts will seldom interfere in the financial arrangements or methods of management of a business. (Citing cases.)"

Another case is *Southern Bell Tel & Tel Co.* v. *Ga. Public Service Commission,* 203 Ga 832, 49 SE 2d 38, 64, where the freezing payment did not begin until 1941, and the only evidence offered by the defendants why the expenditures should not be allowed was that the parent American Holding Company had determined that the fund was insufficient, and that the assessment is a charge against

the rate payers of Georgia over and above current pension accruals, and the court said:

> "* * * There is no evidence disputing the fact of payment or the propriety or necessity for the payment. Such a payment was approved in *State ex rel. Pacific Tel. & Tel. Co.* v. *Department of Public Service, supra.* It is a proper operating expense and must be considered in computing rates."

These two cases were cited with approval in the former case, 115 Vt 495, 510, and we stated: "From the cases just above cited it appears that the action taken in 1937 in respect to these 'freezing payments' should be sustained unless it was arbitrary or so unreasonable as being an abuse of discretion on the part of those making the decision."

There are three other recent decisions from courts of last resort to somewhat similar effect. They are *Alabama P. S. C.* v. *Southern Bell T & T Co.,* 253 Ala 1, 42 S2d 655; *Southern Bell T & T Co.* v. *Public Utility Com. of Tenn.,* 81 PUR (NS) 584; and *In re Northwestern Bell T. Co.,* S. D., 43 NW2d 553. We quote from the Alabama case:

> "The evidence on this item which is without conflict shows the following. The Company's pension plan was inaugurated in 1913 and has been in effect on a non-contributory basis for 35 years. Under the pension plan only reasonable pensions are provided for the Company's employees and the amounts paid into the pension fund to provide for such pensions, including the 'freeze' payments, are irrevocably dedicated to service pension purposes so that the Company can never recover such payments, or any part of them, for use as general corporate funds. Provision is even made that, in case of termination of the plan, the balance in the fund will be applied to service pensions for the Company's employees. The Company's pension plan is an economical method for meeting the cost of superannuation, which every going business must meet in some manner. The plan is a beneficial factor from the viewpoint of stabilizing employment.

The benefits that flow from the economical handling of the inescapable problem of superannuation, employment stabilization and increased efficiency as a result of this plan, make the plan beneficial to the Company, to the subscribers and to the Company's employees. The 'freeze' item, arising from the method employed in financing the plan under the present sound economical accrual basis of financing, is a necessary part of the cost of providing reasonable pensions for the Company's employees, is a regularly recurring item, is actually disbursed to the pension trustee currently and is, like all other payments into the pension fund, irrevocably dedicated to service pension purposes and is not recoverable by the Company for use as general corporate funds. The accrual amounts that are paid into the pension fund, including the 'freeze' payments, are based upon sound, actuarial studies and factors developed by competent and responsible actuaries, which studies and accruals are audited and endorsed by Mr. George B. Buck, one of the outstanding consulting actuaries in the country. In view of the irrevocable dedication of the payments into the pension fund to service pension purposes, there is no motive for the Company to pay into the fund either more or less than the amounts actually required for service pension purposes."

In the case of *New England T & T Co.* v. *United States, supra,* cited by the Commission, the court said:

"The Commission emphasizes that this is an accounting case, not a rate case. It is understandable that the plaintiff should desire to obtain an advance determination of the status of the payments in question for rate-making purposes, so as to guide its future policy in reference to the Pension Plan. But we know of no way in which such advance determination can be obtained; certainly it cannot be had in the present proceeding. The mere accounting classification of the charges now in question can conclude neither the Commission nor the plaintiff at the hearing of a sub-

sequent rate case. (Citing Cases.) Even if the Commission had allowed the additional charges to Account 672 begun in 1937 to remain in that account unchallenged, the Commission, in a subsequent rate case, could still have questioned the propriety of treating such payments as current operating expenses, and under Sec. 220 (c) of the Act the burden of proof would have been upon the plaintiff to justify such accounting entries. On the other hand, exclusion now from Account 672 of a portion of the charges which the plaintiff seeks to make to that account will not preclude the plaintiff, in a rate case, from making a showing that a step rate accrual was a reasonable method of allocating costs of providing for pension disbursements under the Plan, and that the arresting payments in question should be treated as current operating expenses for rate-making purposes. Our refusal to set aside the Commission's order leaves that question as wide open as before."

*In Re Village of Lake Placid, supra,* cited by the commission, was expressly overruled in *Re Uniform System of Accounts,* 82 PUR (NS) 161, where the New York Commission said:

"We must, therefore, conclude not only as a matter of modern economic thinking, but as required by law and accepted practice, that pensions are wages and constitute a present benefit. Hence, we must expressly overrule the decision in the *Lake Placid* case and hold that upon the establishment of a pension plan, whether based on past or future services, or both, the entire charge becomes an operating expense, not an income deduction or a charge to surplus. * * *

"We must, however, make our determinations in the regulation of utilities so as to remove any obstructions from the path of collective bargaining and to adopt those policies which promote good labor relations and, therefore, better service to the public. For this reason alone, even if we were not compelled to make the determination by the modern legal concept

of pensions, we should adopt the principles enunciated here."

In *Petition of New York T. Co.*, 84 PUR (NS) 267, the New York Commission had occasion to consider freezing payments similar to those here, and disallowed a portion of the New York Company's freezing payments because that company did not institute them until 1941. That commission felt that the freezing payments should have been instituted in 1937 when the federal income tax laws were amended to permit the deduction of the freezing payments as operating expenses.

In this connection the state in its brief says: "If the company had adopted in 1929 the present freezing charge of 3% on the unfunded actuarial reserve requirement as it then existed, such requirement would have remained substantially constant, and would not have grown to its present amount of $24,810,869.00 * * * and it undoubtedly would have been proper so to do."

In recent years we have come to recognize that it is not feasible for a going business to institute a pension plan applicable only to those employees who enter service after its adoption, or a plan that does not give employees near the retirement age at the time of its adoption equal treatment with those entering service thereafter. As was pointed out in *Re New England Tel & Tel Co.* v. *United States, supra:*

"A pension plan would not be fair and adequate and would not achieve its full purpose if employees who were near the retirement age at the time of its adoption had their pensions cut in proportion to the shortness of their active service subsequent to the adoption of the plan."

Whenever a non-contributory pension plan is instituted the inevitable result is that the entire cost is passed on to the consumer, regardless of whether the business is a private one or a public utility, and, in case of the adoption of an accrual plan when there are employees with past service, the hard fact is that present and future consumers must, as a part of such cost, make up in some way for the accruals which would have been paid by past consumers had the plan been instituted when such employees began service. It necessarily follows that, despite the 1926 memo of the comptroller of the parent company, the expense of interest upon the unfunded

actuarial reserve requirement must fall upon telephone users subsequent to the adoption of the accrual plan and that such interest does not represent cost applicable to a past period.

Because of the lack of statistical data when the fifteen-year plan was adopted on Oct. 1, 1927, and the short period that plan was in effect, only fifteen months, we do not think that the failure of the company's management to then provide for taking care of the unfunded actuarial reserve requirement was such as to justify the commission in finding that it was so unreasonable as to constitute an abuse of discretion.

Had the freezing payments been started in 1929, they would have been considerably smaller, and we should have had no hesitation in holding that they would have been proper, and the state so admits.

The only difficulty is the delay in starting the freezing payments. Judged by hindsight, it is now very apparent that freezing payments should have started in 1929, but we think that the management must be judged by what it then knew or ought to have known. The Bell companies were pioneers in adopting the full service non-contributory plan in 1929, and the costs of pension plans as operating expenses were not then as readily and widely accepted as today, and it was the hope of company officials that the resulting increased expense could be absorbed by it, and that it would not be necessary for it to ask for rate increases at that time. Their hope should be viewed in the light of economic conditions prevailing in 1927 through the early part of 1929. No one then anticipated the approach of the longest and worst depression in our history. Viewed in the light of the circumstances we do not think that the action taken by the company's management was ever such as to be so unreasonable as to constitute an abuse of discretion.

The State suggests other measures that could have been taken, but we are only concerned with the reasonableness of the action taken by management.

The exceptions of the company to the disallowance of the freezing payment are sustained.

## OTHER EXPENSES

The company asked to be allowed as an expense the sum of $1600 as interest at 4% paid by it on customer deposits as provided in its filed tariff. The commission found that the money advanced by consumers is used by the company and in effect constitutes part of

its working capital, stating that the principal amount is included in the working capital, and that the interest is the cost of capital. To the disallowance of this item the company excepted.

■ The commission elsewhere allowed the sum of $464,300 requested by the company as working capital. This request was exclusive of the amount of customers' deposits, as shown by the company's exhibit. The state's witness in his study included a much larger sum for working capital. There is a discrepancy here. If on another hearing these deposits are not found to be a part of the $464,300, it would seem that this item should be allowed.

The commission found as to the expense of property used in common as follows:

> "Certain property located in Boston is used by the General Office force for the operation of the Company as a whole.
>
> "Also, certain property located in Springfield, Massachusetts is used by the Western Division, of which Vermont is a part, for the operation of the Division as a unit.
>
> "The intrastate portion of the expense of such property used in common is allocated between the states on the basis of certain factors for each of the items of property and classes of expense. Vermont's share for 1949 is estimated by the petitioner at $70,000.
>
> "In 1948, such allocation to Vermont was $31,317. The increase of nearly $40,000 appears to be due almost entirely to the inclusion of the new multi-million dollar building on Franklin Street in Boston. There is nothing in the evidence to establish that Vermont telephone users will benefit in any material way by this elaborate building. We hold that the Company failed to sustain its burden of establishing this allocation as proper.
>
> "There is also no evidence to show that the services performed in Boston or Springfield, especially as to customers' accounting, could not be done at a lower cost in Vermont.
>
> "We find that $40,000 is the proper allowance for Vermont's intrastate expense for Property Used in Common—(Two or More States)."

The company excepted to this finding on numerous grounds, but as there is to be a rehearing we only consider the exceptions to the paragraph about the new building and to the following paragraph concerning customers' accounting.

The function of a public service commission is that of control and not of management, and regulation should not obtrude itself into the place of management. The matters of the erection of new plant and buildings and of the place where accounting shall be done, as well as of other expenses call for the exercise of judgment on the part of management. Good faith on its part is to be presumed. Although expenses chargeable to these matters should be scrutinized with care they should not be disallowed or reduced unless it clearly appears that they are excessive or unwarranted or incurred in bad faith. Former case, 115 Vt 494, 510, 511, and cases cited.

We need spend no time with the paragraph about customers' accounting. The reason assigned does not comply with the foregoing.

The company serves much the greater part of New England, and the matter of the need for, and the kind of, a building to house its general offices, such as the building in question, must be judged accordingly. It is said in *Banton v. Belt Line Ry. Corp.*, 268 U S 413, 421, 45 S Ct 534, 537, 69 L ed 1020, 1026:

> "Operating expenses which are incurred on account of all passengers carried, and which are not capable of direct allocation to any class, should be attributed to the transfer passengers in question in like proportion as such expenses are fairly chargeable to other passengers receiving like service."

This rule applies here. Unless it is made to clearly appear that the company went to excessive or unwarranted expense or acted in bad faith in providing accommodations for its general offices the Vermont telephone users must bear their share of the increased overhead resulting therefrom. This exception is sustained.

As there must be another hearing when there will be an opportunity to present actual operating expenses for the two years since January 1, 1949, rather than estimates, we do not discuss the company's exceptions to the findings relative to numerous other expense items. However, we think that the commission in determining

depreciation should find the depreciation rates for the different classes of property according to the Uniform System of Accounts, as prescribed by the Federal Communications Commission, such system having been adopted and promulgated by the commission. The amount and rate of depreciation for each class of property should be found.

## Cost of Stock Capital. Debt Ratio

The company has outstanding a funded debt capital of $135,-000,000 represented by long term bonds, and an equity capital of $165,000,000 represented by common stock with a par value of $100 per share. It has financed its extensive post-war construction program by temporary loans from the American Telephone and Telegraph Company in the amount of $94,800,000, and now wishes to procure new capital in the amount of $125,000,000 by selling long term bonds and common stock for the purpose of paying these temporary loans and getting further funds to continue its construction program. It is not permitted to sell stock at less than par. Its present debt ratio, including the temporary loans, is 57.7%. In procuring the new capital the company's management has determined that in its judgment it should be so funded as to result in a 35% debt ratio.

The commission determined the aggregate annual cost of the company's present funded debt to be 3.57%, and that the future cost of debt capital will be 3.12%. These figures are not in dispute here. The commission finds that the present cost of equity capital is high, and that the present cost of debt capital is low and that there is an ample supply of capital funds in institutions, such as banks and insurance companies, where legal restrictions deny investment in common stock equity. While recognizing that rate making proceedings should be designed to enable the company to achieve a capital structure which is balanced and elastic, composed of such classes of securities that will enable it to obtain new capital and afford it a considered selection as to the mode of finance which would be most favorable under current market conditions, the commission conceives it to be the duty of the company as a public service enterprise to adopt the most economical methods of financing, consistent with maintaining that degree of flexibility in capital structure necessary to assure its future ability to sell any securities that may be desirable, and states that recognition of these principles does not

compel it to submit to the extravagant requests of a utility for equity capital under market conditions which do not justify its exclusive use as a means of fulfilling the company's financial requirements, and that the maintenance of a low debt ratio should be compatible with the interest of the rate payer as well as that of the investor. The commission finds that a present debt ratio of 45% would be entirely consonant with the economic well being of the company, and states:

"There is no question that the debt ratio may be further reduced economically with proper consideration to both the consumer and the investor as market conditions change to afford more favorable opportunities to increasing equity capital.

"For the computation of the cost of money, we, therefore, accept the debt ratio of 45% as proper after examination of comparative debt ratios in other utility industries, consideration of the relative stability of net telephone earnings, and the nature and quantity of the petitioner's telephone plant in general.

"We feel that the proper balance in this respect is 45-55% ratio of debt to equity rather than the $33\frac{1}{3}\%$ to $66\frac{2}{3}\%$ ratio which has been the historical yardstick of the Bell System, in times when market conditions and income tax requirements were considerably less demanding."

The principal contention in opposition to the decision of the commission is that debt ratio is a matter for the exclusive determination of management. The answer to this is aptly put in the recent case of *New England T. & T. Co.* v. *Department of Public Utilities,* Mass, 97 NE2d 509, as follows:

"But we think in this instance, in the circumstances now existing and especially in proceedings upon the 'cost of capital' theory, the debt ratio is not a matter of that kind. This company is in effect seeking additional capital and higher rates in order to obtain and support such additional capital. Debt ratio substantially affects the manner and cost of obtaining new capital. It seems to us that to say the department could not even consider debt ratio would be to blind

> its eyes to one of the elements in the problem before it. From the standpoint of the company it might be better to have no debt capital at all. An honest board of directors might think so, and at least from the standpoint of loyalty to the company's interest it would be difficult to say that they had abused their discretion. Yet the evidence shows that such a decision under present conditions might well double or even triple the cost of new capital and increase correspondingly the burden laid upon the public for obtaining it. Surely the department could give consideration to this matter."

We recognize the dangers from long term debt, but we are not prepared to say that the finding that a present debt ratio of 45% would be consonant with the economic well being of the company is not justified. This exception is not sustained.

On the basis of a 45% debt ratio the company is authorized to procure the additional $125,000,000 of capital by issuing bonds to the amount of $56,250,000 and common stock to the amount of $68,750,000. When such bonds and stock are sold it will have a total debt capital of $191,250,000 and a common stock capital of $233,750,000. The commission arrived at the figure of 6.65% as the cost of present and future equity or stock capital, and found that on the basis of such total capitalization the composite cost of capital would be 5.21%. To this latter figure it added one-half of 1% to take care of uncertain economic factors, and arrived at the figure of 5.71% as the maximum that the investor can expect. This last figure the commission adjusted down on account of shortcomings in the company's telephone service and its loss of subscribers due to increased rates, and arrived at the figure of 5.5% as the rate of return and the point where the interests of the consumer and the investor are equitably balanced. According to a computation in the State's brief this would afford a return of 7.2% upon the proposed total stock capital of $233,750,000. The State says that applying the historical pay out ratio of the company enough is left over for a 7% dividend upon stock.

In its findings of what would be an adequate return upon equity capital the commission disregarded the evidence of the company's expert witnesses that under prevailing conditions new stock could not be sold unless the rate of return thereon was substantially more

than 7%, and based its conclusion upon the 5.94% average earnings-price ratio of the company for the period of 1939 to and including 1946, to which it added 12% to cover cost of issuing new stock, under-pricing and a possible rise in the cost of equity capital, thus arriving at the figure of 6.65% as the estimated cost of present and future equity capital.

We need not go into the merits of the period selected for arriving at the average earnings-price ratio, and for the purposes of our discussion we will assume the correctness of the commission's conclusions quoted below, which were in part based upon a book not in evidence:

> "In analyzing the cost of equity capital, the State's witness Lindahl placed considerable reliance on earnings-price ratios of the company in computing the cost of equity capital. We recognize that the relationship of earnings to market price over any given period cannot be accepted blindly as the only test of the investor's appraisal of any particular stock. We find that the long-term ratio of available earnings to the market price of common stock is a reliable indication of the price of common stock capital. It is true that the earnings-price ratio at any given instant may be affected by a variety of circumstances including yield to stockholders in dividends, anticipated future yields, prospects of capital gain, current political factors, price trends in the general market, debt ratio of the company to its total capitalization, and, sometimes emotion, fears and hopes. However, in the long run with a reasonable period of time considered, influences of these factors tend to be reduced, leaving the average earnings-price ratio over an extended period of time as a fair standard upon which to predicate anticipated cost of equity. See Barnes, The Economics of Public Utility Regulation, page 539.
>
> "The company itself employs the earnings-price ratio theory in its consideration of capital requirements of other industries and, in particular, in the comparison of the capital requirements of electric utilities. We accept it for, in our judgment, it reflects the substantial factors weighed by an investor

with respect to the securities of the subject corporation, including the earnings themselves, dividends, contributions to surplus account, financial stability of the enterprise and confidence in management."

We agree about the usefulness of the earnings-price ratio theory, and that under normal conditions the average earnings-price ratio over an extended period of time may be a fair standard upon which to predicate the anticipated cost of equity capital. The commission finds that at the conclusion of the formal hearings in this cause, which was November 21, 1949, the market value of the company's stock was somewhat below par. The evidence of monthly averages shows that beginning with January, 1947, this stock went from 111 gradually down to 94 at the end of the year, and that during 1948 there were only two months when the average price rose to par or above. In June of that year it was 101, and in July 100. In the first four months of 1949 it averaged between 94 and 96. Obviously the company cannot sell any new stock unless the stock rises to par or above. The witnesses differ somewhat as to the amount above par it must go to market a new issue of stock, but all agree that it must go up a substantial amount before the contemplated issue of 687,500 shares can be sold. Assuming that the American company will take the full 68.92% to which it is entitled out of any new stock issued, although it is not bound to take any and might not do so, there is the necessity of selling a large block to the general public somewhat in excess of the total of 211,959 shares traded during the eight-year test period. The question therefore arises as to what is the true standard upon which to base the cost of equity capital. Is it to be based upon the expectation that sometime in the future the market price will rise sufficiently to sell this stock, or is it to be based upon more immediate market conditions?

We believe that the correct answer is given in *New England T. & T. Co.* v. *Department of Public Utilities, supra*. In that case the Massachusetts department of public utilities had used the average earnings-price ratio during the period from 1938 to 1946, one year longer than here, and found that 6% upon the company's common stock was "fair, reasonable, adequate, for the company's needs, and likely under normal and representative conditions to maintain the price of the stock at or above its par of 100." Except that our commission made more upward adjustments there is no

difference in the theory followed. Speaking of this finding by the department the court states:

> "This may or may not be true, but it does not reach to the real point. The question was not what return might maintain the stock at par in some hoped for representative period. The question was a much more immediate and practical one. Here is one of our greatest and most necessary public utilities. It cannot be permitted to fail in its service to the public. It was legally and morally bound to increase its service to meet an insistent public demand. It did so by borrowing $120,000,000 on demand notes from a source which fortunately was available to it. It must repay this money in the near future. It cannot expect to retain this borrowed money indefinitely as part of its capital structure. Its only means of repayment is by obtaining new capital. Concededly it must not increase its debt ratio. It must therefore sell a substantial amount of stock. On the evidence it can do this only if it is allowed a return on stock capital substantially larger than the 6% allowed by the department."

There is another matter which is of vital importance. It will be noted from the portion of the findings quoted in our discussion of property held for future use, that the erection of a number of important new central office buildings has been postponed, presumably for financial reasons. In speaking of the quality of telephone service in Vermont the commission states that modern telephone equipment has been slow in finding its way into the company's Vermont plant, and that the State is still burdened with some 57 hand-ringing magneto telephone exchanges, and there are an excessive number of subscribers on rural lines. But the commission also states that the company has been keenly aware of the deficiencies in service and has made an honest effort to improve the service according to its ability. These deficiencies cannot be remedied without funds to do the work. Shall improvements be deferred until the company's stock can be sold at the return fixed by the commission at some indefinite time in the future, or should a sufficient return be allowed to sell the required stock now?

It is to be hoped that the company's stock will make a much better showing in the stockmarket at the time when this cause is reheard, so that it can then be sold at a lower rate of return than in 1949, when this cause was heard. If it does not it will be evident that investors have lost interest in this stock, as intimated in the opinion of the Supreme Judicial Court of Massachusetts, or that investors during the present stockmarket boom prefer to buy stock in industrial corporations as a "hedge" against the current inflation, rather than in utilities. At such time the price of the company's stock may be influenced somewhat by the allowance upon the rate base of $244,185,500 in Massachusetts, which includes reinvested surplus, of a minimum return of 6.23%. The Massachusetts case was a suit in equity, unlike our proceeding. The court there found from the evidence that a return of nothing less than 8.5% will suffice to attract new stock capital at a debt ratio of 45%, and taking 3.45% as the composite net return on debt capital, arrived at the composite net return on both debt and stock capital of 6.23%. It was of the opinion that a net return of less that 8.5% on stock capital or less than 6.23% on both kinds of capital is below the level where confiscation begins. It also found that the company was entitled to a like return upon its reinvested surplus. The result was that the court directed that the order of the department of public utilities be so modified as to provide for a net return of at least 8.5% on stock capital and 6.23% on reinvested surplus.

Nothing stated above conflicts with our holding in the former case, 115 Vt 494, 512, 513, relative to a fair and reasonable return upon the company's investment. It was error for the commission to base its conclusions upon the earnings-price ratio theory in its determination of the cost of equity capital, and to disregard the evidence of the company's expert witnesses.

### Motion to Reopen and Exceptions to Final Order

The hearings in this case before the commission took place during the summer and fall of 1949. The findings were filed February 20, 1950, and were based upon estimates, since figures upon actual operating experience were only available for the latest twelve months ending August 31, 1949. On March 13, 1950, the company filed a motion to reopen the hearing for the limited purpose of the presentation of evidence as to the Company's actual operating results during the year 1949. There were numerous grounds, among which

were that the proceeding involves the determination of just and reasonable rates for the period commencing January 1, 1949, that the Company has been collecting rates under bond and subject to refund, that the findings indicate that a refund will be ordered, and that the commission's findings based upon estimates differ materially from the actual results of the company's operations in 1949. This motion was denied subject to exception. The final order established a schedule of rates to be effective as of January 1, 1949, and directed a refund of all rates collected since that date, in excess of the rates so established. To this the company excepted on numerous grounds, among which were, that the order is without justification by the facts found, and that the effect of such order in the circumstances is the taking of the company's property without due process of law and without adequate compensation and without its consent contrary to the provisions of the second and ninth Articles of the Constitution of the State of Vermont.

We will first discuss the exceptions to the final order. The company says that the order not only prospectively set rates for the future, but also retroactively set rates for the past and especially for the calendar year 1949, and ordered the company to make refunds of a portion of the revenues collected under bond during 1949 and the first four months of 1950. It says that the commission had the duty to determine just and reasonable rates for two different and distinct periods. It had a duty to set rates for the future on the basis of anticipated and foreseeable future conditions, and had a duty to retrospectively set rates for the past. These latter were to be set according to a different standard, viz., the actual experience of the period for which the rates are set. The two duties are separate and distinct and the standards to be applied are different. The commission failed in its duty to determine the reasonableness of past rates on the basis of experienced costs, but instead arbitrarily applied its estimates of future costs to a past period where it knew and expressly stated that its estimates varied materially from the experienced costs. The commission made estimates of what the company's future expenses would be. In many instances its estimates were based upon the future leveling off of extraordinary expenses which admittedly were incurred during the first eight months of 1949. Estimating future expenses by normalizing past expenses may sometimes be justified by unusual circumstances. But the commission did not confine its normalizing to future rate making.

It retroactively applied its normalized future estimates to the past period of 1949. In so doing it expressly disregarded actual expenditures prudently incurred in that year. Its refunding order is based upon this expressed disregard of the experience of the very period to which it applied. The company says for the reasons above stated by it that such an order is void and cannot stand.

Our attention is called to the following statements in the report:

"In determining operating expenses which should be allowed to the petitioner in this cause, we are well aware that actual operating experience of the petitioner as lived during the year 1949 may well produce results which stand at a level higher than the allowance made by this Commission in these proceedings. We can afford no guaranty of accuracy of conclusions for any single twelve-months period. Our investigation has been directed to a study of the latest available facts as well as to the expectancies of the relatively near future, mindful that estimates proper and just today may become outmoded tomorrow. The same inherent weakness applies with equal force to actual operating results available today. The ever-varying curves in all of the voluminous charts and graphs presented for our consideration in all matters relative to the telephone enterprise bear witness to the truth of this assertion. However, the rate-making process is entirely too cumbersome and prohibitively expensive to permit a re-examination from day to day or even year to year. 'In an industry subject to these rapid changes, the prophecies for one year are likely to be overturned by the experience of the next.' Cardozo, J. in *Dayton P & L Co.* v. *PUD of Ohio,* 292 US 290, 305, 54 S Ct 647, 78 L Ed 1267, 1278; *Petition of Central Vt Pub Serv Corp,* 116 Vt 206, 71 A2d 576. Rates should and must be fixed for a reasonable time in the future. We have endeavored to properly interpret trends and probable effects that present causes will produce. For these reasons, we believe it improper as well as impossible to gear our estimates and judgment resting thereon to any single year without

adjustments for expectancies in the relatively near future.

"We trust that rates here established will be operative beyond the single year 1949, that they may extend into the future with a quality of stability vital to the welfare of both the Company and the public."

"Account 604—Repairs of Central Office Equipment

"During the period which is to immediately follow, the Vermont telephone plant will be without a part of the old manual central office equipment which has been replaced by entirely new, step-by-step dial equipment. It seems entirely reasonable to us that the over-all maintenance cost of central office equipment should be materially reduced by such new installations. Eliminating the period for minor adjustments after the new units go into service, maintenance expense on new equipment should be considerably less than that required for the upkeep of the old central office equipment.

"With the adjustments which we deem proper for repairs of central office equipment indicated by the actual experience of the first seven months of 1949, and proper adjustment allowed for extraordinary conditions during that period, we find that expense under this account should be allowed in the amount of $135,000.

"Account 607—Station Removal and Changes

"The Company's estimates as to this account were based on actual experience of the immediately preceding months. This estimate is unduly high in our judgment by reason of the fact that it reflects extraordinary expense incident to the active construction program in 1948-1949.

"The Company informed the Commission that in the instance of St. Johnsbury and Bennington as well as all manual office exchanges which were converted to dial, it is necessary for the company to perform maintenance chargeable to this account on each individual telephone station in the exchange in order to prepare

the plant for the conversion. Also, this account has been unduly inflated by reason of the efforts of the Company to comply with the excessive demand for new stations and upgrading of service immediately following the termination of the war. The record affirmatively indicates that this phase of plant expansion has reached its peak and is now levelling off with an actual decline in the number of stations. Charts submitted by Witness Hill in support of State's Exhibit 105 fairly reflect these trends and the projections on which his estimates are founded appear to us to be well considered. We find that the revision of its construction program by the Company will have the effect of producing a more rational balance in maintenance costs. We find that maintenance expense related to Station Removal and Changes, Account 607, should be allowed in the amount of $125,-000."

The commission in its report allowed under Account 605—Repairs of Station Equipment, $300,000. It later amended this, and its report under Account 607, by taking $20,000 from Account 605 and adding that amount to Account 607, stating:

"We have determined that the effect of dial conversion at St. Johnsbury and Bennington as related to station equipment introduced an exaggeration of such maintenance charges in the amount of substantially $20,000. By reason of the fact that it was necessary for the company to perform maintenance as to each individual telephone station included in the communities served by dial equipment at its central offices, the overall result of our maintenance account allowance is unaffected by the error above referred to. We, therefore, find that our allowance of Account 607 should be increased to the amount of $145,000 by removing this factor and Account 605 should accordingly be reduced to $280,000 in order to correctly assign the effect of dial conversion upon maintenance of station equipment under the proper account. This does not affect our allowance of Maintenance Ex-

pense in the amount of $1,060,000 which amount is reaffirmed."

"Traffic"

"Petitioner—$1,573,500          State—$1,554,933

*     *     *     *     *

"In view of the trend and the comparative accuracy of the study accomplished by Hill, when considered in the light of known savings to be accomplished on an annual basis by virtue of the Bennington and St. Johnsbury cutovers in the years subsequent, we find that the amount submitted by Witness Hill for Traffic Expense to be reasonable and proper. Traffic Expense is allowed in the amount of $1,554,933."

■ Neither the propriety nor the reasonableness of the company's 1949 expenditures is questioned and the commission's lower estimates for the future are based solely on the assumption that future expenses will be lower. The commission applied these future estimates to 1949, and ordered refunds on that basis. For these reasons we hold that the refunding order is fatally defective. As said in *West Ohio Gas Co.* v. *Public Utilities Com. of Ohio,* 294 US, 79, 55 S Ct 324, 79 L ed 773, "But prophecy, however honest, is generally a poor substitute for experience. * * * We have said of an attempt by a utility to give prophecy the first place and experience the second that 'elaborate calculations which are at war with realities are of no avail'. * * * We say the same of a like attempt by officers of government prescribing rates to be effective in years when experience has spoken. A forecast gives us one rate. A survey gives another. To prefer the forecast to the survey is an arbitrary judgment". This case is unlike *Petition of Central Vermont Public Service Corp., supra,* cited by the commission. There the commission used the test year basis.

■ Under V. S. 47, § 9368, the commission upon hearing, when rates filed are found to be unjust or unreasonable, may substitute therefor such rates as shall be found to be just and reasonable. This applies to proceedings under V. S. 47, § 9376, under which the rate schedule in question took effect upon the filing of a bond. There is nothing that prevents the commission in a case like this from fixing one rate for 1949, and one rate for 1950, if justice requires it to do so. It clearly should have done so in this case, upon the theory

upon which it made its findings; whether it should do so in another case depends upon the circumstances.

The State advances several arguments against this holding. It says, in effect, that this is impractical, because once granted, the principle might require it to set different rates for the first few months of 1950. This does not follow because a full year is a cycle during which the company receives benefits and disadvantages of climatic and seasonal conditions. It says, in effect, that the company's position would be different, had its 1949 earnings been high. Speculation upon this is fruitless. It says that such a procedure would have added to the labors of the commission. Justice is not to be sacrificed to expediency. As said in *Atchison, T. & S. F. R. Co.* v. *United States,* 284 US 248, 52 S Ct 146, 150, 76 L Ed 273, "And the prospect that a hearing may be long does not justify its denial if it is required by the essential demands of justice". It says that it would encourage unnecessarily high expenditures during the period between the filing of new rates by the company and the commission's order. This assumes something not in this case. Bad faith is not presumed.

The State further says that not expenses, but the order of the commission determines rates, and that rates, after all, do not wholly depend upon how many dollars are spent. Since the reasonableness of the company's expenses is not questioned by the commission they must be taken into consideration in fixing rates. Rates to be fixed must be such as will produce sufficient revenue after deducting the allowable expenses to allow the rate of return determined upon. Former case, 115 Vt 494, 498.

The State also says that the order of the commission should and would have been made as of November 21, 1949, the day the case was closed, except that time was required for the consideration of the evidence and exhibits. The fact is that the effective date was April 18, 1950.

The motion to reopen and the exhibits attached thereto gave actual operating results for 1949. They showed wide differences between the amounts allowed by the commission in a considerable number of items. The commission found that the rates put into effect by the company under bond have produced a 7.37% rate of return. The motion states the actual results of 5.81% after giving effect to the commission's disallowances. The commission allowed $72,342 as the amount of the rate case expense incurred during

1949, to be amortized over a period of five years. The motion states the actual expense for the year was $190,000, that the figure used by the commission was the total for seven months ending July 31, 1949, although the eight months' total of $83,457 had been supplied to it, and although an examination of its own records would have revealed to the commission substantial additional amounts paid prior to the end of 1949. In argument it was pointed out to us that the expense of the State's counsel and expert and other witnesses, the reporter, etc. were approved by the commission and forwarded to the company for payment pursuant to statute, and the commission should have been aware of the bills it had approved for payment.

There is no particular formality about such a motion as the State suggests, nor was it too late, because the evidence to be presented did not become available until the end of the year, and it was presented within the time reserved to file additional requests for findings. In its disallowance the commission stated that at the time the report was filed it was mindful that it could not hope to arrive at any exact computation of the company's expenses for 1949, and so expressed its inability in the body of the report. Although the allowance of such a motion is discretionary, we think that its disallowance here constituted an abuse of discretion. It would not have taken long to hear the new evidence, and in view of the wide discrepancy between the commission's estimates and the actual experience, the commission should have gone to the trouble to hear the company's evidence and the State's evidence in reply thereto. Had it done so, it could have determined just what the lawful expenses actually were, and have based its findings upon facts rather than estimates.

Upon a new hearing the commission can determine actual operating results for both 1949 and 1950, and it should do so. As the rates to be fixed will take into consideration the 1700 borderline stations, both cases must be reversed.

*The two orders of the public service commission dated April 18, 1950, are reversed, and both causes are remanded for a hearing de novo in accordance with the views herein expressed.*

## The Exceptions of the State Relating to Its Claim of Discrimination

JEFFORDS, J. Within this state there are approximately 1700 telephones which are served by central offices located in the neigh-

boring states of New York, Massachusetts and New Hampshire. These telephones are called borderline stations. From at least 1925 to 1941 the subscribers in this particular classification paid the same rates as those established on a company-wide basis. There was no specific or formal tariff filed with the Vermont Commission relating to these stations until 1941. In that year a schedule designated as section 7 was filed which set forth the rates applicable to these stations.

Telephone charges incurred by the borderline stations are collected by the central office located outside this state which serves the particular station. The revenues so collected are credited to the Vermont operation in the case of funds collected by New Hampshire and Massachusetts. In the case of New York, the New York Telephone Company, a part of the Bell system, is paid for the telephone service afforded Vermont subscribers through New York exchanges.

The original connection carrying borderline stations to an out of state exchange was made because of the proximity of the Vermont station to such an exchange. Generally, the community in which the out of state exchange is located is the trading center for those subscribers. The 1700 borderline stations constitute about 2% of the approximate 83,000 telephones which the company has in Vermont.

The company filed rate schedules effective February 1, 1947, December 1, 1947 and January 1, 1949 which increased local service charges for the so called section 2 stations (telephones served by Vermont exchanges) but did not increase the tariffs for the borderline exchanges which remained constant at the 1941 level of the foreign exchange to which they were attached.

On September 8th, 1949, during the course of the proceedings relating to the increase in rates effective January 1, 1949, the company filed proposed tariffs which were designed to increase the rates charged the borderline stations to the level of the rates proposed for other Vermont telephone subscribers of the company for exchanges of comparable available telephone connections.

The increase in telephone revenues incident to the filing of January 1, 1949, had it included the borderline stations would have resulted in an increase in operating revenues in the amount of about $31,000. This amount divided among the 1700 borderline subscribers is equivalent to $18.24 difference in the amount paid by

them during 1949 and the amount they would have paid if they had been charged the increased rates for that year.

The contention of the State as set forth by the commission in its report is: "The failure of the petitioner to exact increases in telephone rates and charges from the borderline stations constituted a discrimination which, in substance, infected all the proposed rate increases collected by the petitioner since December 1, 1947, in that a lesser tariff has been collected from these 1700 stations than from the state at large. Therefore, the State argues all revenue collected under bond subsequent to December 1, 1947, should be refunded as the only proper way for the Commission to eliminate the alleged discrimination."

After referring to V. S. 47, §§ 9366 and 9368 which are statutes conferring jurisdiction on the commission to restrain a company subject to its supervision from unjust discrimination and to substitute just and reasonable rates for those found to be unjustly discriminatory, the commission discusses the matter of unjust discrimination to some extent and then states: "The effect of the petitioner's collecting from all of its Vermont customers except the borderline stations has amounted to a differential charging. The issue before us is whether or not such difference in rates constitutes 'unjust discrimination'. Is it of such evil character that the Commission should endeavor to eradicate it by compelling a forfeiture of all money collected under bond by the petitioner throughout Vermont subsequent to December 1, 1947, whether or not the company earned a fair rate of return on its property in the light of the revenues collected? Such a penalty for the act of omission by the petitioner is, we believe, beyond our authority to exact under our statutes."

The commission then discusses at some length the question of whether there was here unjust discrimination and found that the failure of the company to include the borderline stations in its filing of December 1, 1947 and of January 1, 1949 did not constitute an act of unjust discrimination within the prohibition of the statute.

The commission concluded its treatment of the borderline stations in its report as follows: "We charge the Company, however, with revenues which will reflect the amount which should have been collected from the borderline stations in the computation of the total annual revenue, thus relieving the remainder of the subscribers in Vermont from the burden of contributing to the over-all revenue

as a result of the failure of the Company to collect that which it should have required from its borderline customers."

The commission by its order dated April 24, 1950, approved the rate schedules filed by the company for the period from December 1, 1947 through December 1, 1948 and the bond under which these rates were put into effect was discharged. The State excepted to this order on the grounds, in substance, that it was erroneous because of the failure of the commission to correct the claimed discrimination in favor of the borderline subscribers by requiring the company to refund all sums collected for exchange service during that period in excess of the rates effective February 1, 1947, and because the order did not reduce rates charged and collected under bond from a majority of subscribers to the level of rates charged and collected by the company from the borderline stations and for the additional reason that the order is discriminatory.

The commission by its order dated April 18, 1950, approved the rates for exchange service which had been filed by the company pursuant to the interlocutory order of the Commission dated April 10, 1950 covering rates from January 1, 1949 and ordered a refund of all sums collected in excess of these rates from January 1. 1949 through April 20, 1950. The grounds of the exceptions of the State to this order are the same as those set forth as a basis for its exceptions to the order of April 24, 1950.

The commission by its order dated April 18, 1950, disapproved the rates filed by the company to take effect November 1, 1949 and approved the rates ordered in substitution therefor by the commission. These latter rates to become effective April 20, 1950. No exceptions to this order on the ground of discrimination were taken by the State.

There is no doubt that under the decisions of this Court, and under the pertinent statutory law of this State, the public service commission has the power and the duty to prevent unjust discrimination in rates charged by a public utility in the state and to substitute rates found to be just and reasonable for those found to be unjustly discriminatory. No good purpose would be served, and this opinion would be unduly prolonged, if we were to discuss the cases and the statutes which cast this power and duty on the commission. We have heretofore referred to two such statutes. We will assume, without in any way deciding, that there was on the facts in the case at bar, unjust discrimination prohibited by statute.

The question remains whether there was error in the ruling of the commission refusing the refund requested by the State and in the method which it adopted in disposing of this matter of the borderline stations.

We may sustain the ruling upon any legal ground although it was made under an erroneous theory, if the ruling is correct. *Meyette* v. *C. P. Ry. Co.,* 110 Vt. 345, 355, 6 A.2d 33; *Union Co-operative Store* v. *Fumagalli,* 107 Vt. 145, 148, 175 A 847.

Discrimination in rates may be removed by raising the lower rate, lowering the higher rate, or by equalizing by a combination of both. *American Express Co.* v. *South Dakota,* 244 U. S. 617, 37 S Ct 656, 61 L. ed. 1352; *Texas and P. R. Co.* v. *United States,* 289 U. S. 627, 53 S Ct 768, 77 L Ed 1410; *Fesler* v. *Pacific Tel. & Tel. Co.,* 4 Cal. R. C. R. 711.

By V. S. 47 § 9368, as heretofore noted, the commission may substitute for rates found by it to be unjustly discriminatory such rates as it shall find to be just and reasonable. The State claims, in effect, that the only proper method for the commission to have adopted in this case would have been to remove the discrimination by lowering the higher rates charged the majority of the telephone subscribers in this state during the periods in question to the lower rates charged the borderline subscribers from December 1, 1947 to April 20, 1950. It is apparent that if refunds had been ordered on the basis of the rates in effect prior to December 1, 1947, the order would not have resulted from any determination by the commission of just and reasonable rates to be charged the borderline subscribers for the service they received during any of the material periods. It would have disregarded the question of whether or not the company earned a fair rate of return on its property from December 1, 1947, to April 20, 1950, as stated by the commission.

Figures compiled by the company, and not disputed by the State, disclose that if the refunds asked for by the State had been ordered they would have amounted to $2,605,000. Other such figures show that if the request for refunds had been granted the result would have been that during 1948 the rate of return on the net investment of the company would have been minus 1.69% and that during 1949 such rate of return would have been minus 3.80%. In short, the granting of the requested refunds would have absorbed all the net earnings and would have created a deficit for those two years.

The commission, as before noted, ruled that it was beyond its authority under our statutes to require the refund requested by the State. This ruling was correct, as the commission had no power to cure discrimination in rates by an order which would result in the company operating under unreasonably low and confiscatory rates during the period when the assumed unjustly discriminatory rates were in effect. *National Dock & Storage Warehouse Co.* v. *Boston & M. R.,* 227 Mass 197, 116 N. E. 544; *Re Lincoln Tel. & Tel. Co.,* Nev, P. U. R. 1924 B. 466. See generally on this subject Public Utility Service and Discrimination by Ellsworth Nichols, pages 867-871 inc.

The Massachusetts case, *supra,* involved discrimination in a rate charged by the defendant. The public service commission of that state ordered the discrimination removed by filing new tariffs and the order was complied with. An injunction was obtained which suspended the operation of the new rates. The commission then ordered the defendant to remove the discrimination in another way and stated "Whether such compliance would result in unreasonably low rates for the service rendered it is unnecessary for the Commission at this time to decide."

The case came before the Supreme Judicial Court of Massachusetts on a petition for a writ of mandamus to compel the defendant to comply with the order of the commission. The Court dismissed the petition.

At that time there was a statute in force in Massachusetts similar to V. S. 47, § 9368 which the court quoted in its opinion and then says in reference to the statute: "It was the duty of the Public Service Commission under the statute, since under the circumstances here disclosed the discrimination arose out of a rate to 'determine the just and reasonable rates' to be charged. An order baldly directing a carrier to remove a discriminatory rate when the only possible way in which that discriminatory rate can be removed is by making a substantial reduction in its rates, and where there is not election to raise some rates or reduce others, without at the same time determining what is a reasonable rate, is not an exercise of the jurisdiction conferred. The determination by the Commission that whether compliance with its earlier order 'would result in unreasonably low rates for the service rendered it is unnecessary for the Commission at this time to decide' was not in conformity to law. * * * When the orders of the Commission according to its own

statement required a reduction of rates, it must make a further decision based on evidence that such reduced rate would be fair and reasonable and not confiscatory before its earlier orders would be ripe for enforcement. The wisdom of this requirement of the statute is illustrated by the case at bar."

The holding in the Lincoln case, *supra,* was to the effect that discrimination in favor of subscribers in one exchange of a telephone company should not be eliminated by reducing all the rates to the level of that exchange when the return of the utility does not warrant such action.

Although the factual situation was different in *Callender* v. *Northern States Power Co.,* 192 Minn 591, 257 NW 512, the following language contained in the opinion is pertinent: "A public service corporation, intentionally or by mistake or otherwise, may have rendered one of its patrons free service, or service at reduced rate for some reason that to it appeared just and reasonable. If every patron of the corporation upon ascertaining that fact should be entitled to recover as damages all he has paid during a period of years in excess of the rate charged some other patron, though he has received full value for all he has paid and has suffered no personal loss because of the discrimination, the damages so awarded him become more of a penalty against the corporation than a compensation for loss sustained. It can be readily seen that the penalties might be so large as to wipe out the corporation and all the interests of its stockholders. This might occur although the corporation had not obtained from any patron more than the maximum rate allowed by law, hence no more than the reasonable value of the service rendered."

The State has not cited a case upholding its claim that the commission should have ordered the refund sought. It relies to a large extent in support of its contention on various statements appearing in the opinion in *Postal Telegraph-Cable Co.* v. *Associated Press,* 228 NY 370, 127 NE 256, to the effect that courts will not help a utility to enforce a discriminatory overcharge or any illegal scheme. That case had to do with an attempt by the plaintiff to enforce a discriminatory and 'overcharging contract. The statements referred to were pertinent to the factual situation in that case, but in the present case the company is not attempting to enforce any such contract nor is it seeking the aid of the courts in the furtherance of an illegal scheme to sustain rates which are discriminatory or which constitute overcharges. In the case at bar the company is merely

supporting the ruling of the commission that it had no jurisdiction to order the refund requested by the State.

The State says that the commission has no jurisdiction to order a retroactive increase in rates to its borderline customers. It cites in support of this claim V. S. 47, § 9375 and § 9376 as amended by No. 222 of the Acts of 1949 and *Fesler* v. *Pacific Tel. & Tel. Co. supra.* These statutes, as far as here material, provide that a public utility shall not increase its filed rates except upon thirty days' notice to the commission and upon such notice to parties affected as the commission shall direct and that the commission on its own motion or upon the motion of one or more persons adversely affected by the change in a rate may order an investigation and hearing on the justness and reasonableness of the proposed new rates. The holding in the Fesler case was to the effect that a public utility may reduce rates to remove discrimination without a hearing or determination by the commission that discrimination exists but that discrimination may not be eliminated by increasing a rate except upon a hearing before the commission and a finding by it that the higher rate is justified.

These statutes and the case relied upon by the State do not apply to the situation here. Although the order of the commission charging the company as revenue for 1949 the sum of $31,000, representing the amount which it would have collected from the borderline stations for that year if these stations had been included in the filing which took effect on January 1 of that year, was in form a retroactive increase in the rates of the borderline subscribers, it was not such an increase in fact or in substance. This is so because these subscribers were not required to pay any increased rates during that period. The statutes above referred to were designed to protect subscribers from the raising of rates and the payment thereof until upon hearing it was found that such a raise was justified. In the present case it was only after a hearing upon the rates filed to take effect November 1, 1949, raising the rates to borderline subscribers, which resulted in their disapproval and a filing by the company of such rates as were approved by the commission by its order of April 20, 1950, that these subscribers were required to pay higher rates than they had theretofore paid.

There was no error in the ruling of the commission refusing the refund requested by the State. It remains to be seen whether the

method it adopted in disposing of the matter of the borderline stations was correct.

As we have seen, the commission charged the company with $31,000 of uncollected revenue from the borderline subscribers during 1949. A refund was then ordered for the period of 1949 on a basis of rates found to be just and reasonable during that period. Thus it is apparent that none of the Vermont subscribers were harmed by reason of any unjust discrimination during that year.

The commission did not charge the company with revenue from borderline stations between December 1, 1947, and January 1, 1949. The reason for not so charging may have been, as claimed by the company, because the rate of return during that period, as determined by the commission, was considered by it to be low. Whatever the reason, it is apparent that the amount of the differential charging for that period would have been less than that for the 1949 period, so if the commission had seen fit to adjust the rates for the December 1, 1947 to January 1, 1949 period, which it approved by its final order dated April 24, 1950, the benefit accruing from such adjustment to the telephone subscribers entitled to such benefit would have been very small. This amount would be so negligible that we would be figuring to too fine a point if we should hold that the failure of the commission to make this adjustment invalidated its method of disposing of the borderline matter. *Dayton P. & L. Co.* v. *P. U. Com., supra.* It appears to us, and we so hold, that the method adopted by the commission, taken as a whole, and under the attending circumstances, was a just, reasonable and correct one to adopt. A similar method was taken by the public service commission of this state in a like situation. *Re. N. E. Tel. & Tel. Co.,* P. U. R. 1927 C 348.

It should be understood that in holding as we have we do not condone unjust discrimination. We could not properly do so in view of the previous decisions of this Court and the pertinent statutes. We have taken this case on the facts and circumstances presented by it and have decided it accordingly.

The exceptions of the State based on the matter of discrimination and relating to the final order of the commission dated April 24, 1950 and such exception relating to the order dated April 18, 1950 covering the rates effective as of January 1, 1949 are not sustained.

524

## Other Exceptions Taken by the State

The State has briefed two exceptions as to the rate of return and telephone rates in general. One is to the ruling that the reduction from 5.71% rate of return to 5.5% brought the rate to a point at which the interest of the consumer and investor are equitably balanced. The other is to the refusal of the commission to grant its request for a finding which was as follows:

> "From as far back as 1925 and up to at least 1946 the Petitioner based its rates and charges (tr. 3889) upon the 'relative value of the service', which it regarded as uniform in Vermont and elsewhere in its territory by classifying in the same groups and applying the same rates to exchanges of equal size regardless of state lines. Tr. 3890-3899, 5236-5238. That is true today as it was up to 1947 and the relative value of the service means the same today as it did prior to 1947, except that the petitioner is demanding more from subscribers in one state than in another notwithstanding the value of the service depends upon the size of the exchange. Judged by the petitioner's standards and procedure in the past the rates effective December 1, 1947 and January 1, 1949 are unreasonably high, unjust and discriminatory. They far exceed the Massachusetts rate the petitioner has been trying to put into force since July 26, 1947."

The exception to the refusal to grant the requested finding is based on the grounds that a schedule of telephone rates should be based on the relative value of service rendered and that the company has failed to sustain its burden of proof by showing that the schedules filed by it with rates to become effective December 1, 1947 and January 1, 1949 are consistent with the relative value of service. It is apparent that the State intended this exception to apply to the matter of the December 1947 rates as well as to that of the January 1949 rates. In the former matter, known as case No. 2346, the commission found "that the rates filed for effect December 1, 1947 are just and reasonable for the period December 1, 1947 through December 31, 1948." No exception was taken by the State to this finding. This ultimate finding embraced all subsidiary matters

pertaining to it including that of the question of the relative value of service now attempted to be raised by the State as a ground for its exception to the refusal to make the requested finding. If this finding had been made it would have been inconsistent with the ultimate finding to which no exception was taken. For this reason, if for none other, there was no error in the refusal of the commission to grant the request in so far, at least, as it applied to the rates effective December 1, 1947. *Holton Estate* v. *Ellis,* 114 Vt. 471, 485, 49 A2d 210; *Nelson* v. *Travelers Ins. Co.,* 113 Vt. 86, 99, 30 A2d 75; *Levin* v. *Rouille,* 110 Vt. 126, 129, 2 A2d 196.

By its final order dated April 24, 1950 these last mentioned rates were approved by the commission and the bond which was filed when they were put into effect was discharged. No exceptions were briefed relating to this order other than the one just disposed of and those based on claimed unjust discrimination which we have held were unavailing. It follows that this order should be and it is affirmed.

The exception to the ruling reducing the rate of return applies only to the matter of the rates effective January 1, 1949. As this exception must be considered, and as the State claims both this exception and the one to the refusal to grant the requested finding pertain to the fundamental duty of the commission to achieve an equitable balance of the interest of the consumer and the investor, so they may be appropriately considered together, and are so treated in its brief, we pass over the question of whether the exception to the refusal to grant the request is also unavailing in respect to the matter of these rates, known as case No. 2437, for the reasons heretofore set forth in respect to this exception relating to the request in so far as it pertains to case No. 2346.

In support of its claim that the commission did not make a sufficient reduction in the rate of return because of the poor standard of service and in support of its claim that the request should have been granted, the State argues that, from the facts alleged in its request and those set forth therein, sustained by the evidence in the case and the findings made relative to the quality of telephone service in this state, it was the duty of the commission to bring the exchange rates paid in Vermont into line with the value of the service as reflected by the charges in Massachusetts, where the company provides modern equipment and superior service. On the other hand the company calls attention to the finding that during the years

1946-48 inclusive "it expended in Vermont for new dial central office equipment a total of $125,914, as compared with $15,712,361 for the company as a whole" as contrasted with the evidence that it spent in 1949 on the St. Johnsbury and Bennington conversions $555,600 and the testimony of the State's expert witness, Hill, that the Vermont dial conversions were being made about as fast as the company could go.

The commission notes the unprecedented demand on overloaded plant during World War II and during the immediate post-war period, and we take judicial notice that this condition was nation-wide. At the rehearing of this cause sufficient time will have elapsed to be able to better evaluate the efforts of the company to give improved service, and, since there must be a rehearing to determine the actual operating results for 1949 and 1950, and to redetermine the rate of return on capital, we forego further discussion of these exceptions.

We do call attention of the commission to what is said in our opinion in the former case, 115 Vt. 494 at pages 507 and 508, in regard to the bearing the rates in other states have on the question of proper rates for Vermont subscribers when it considers the questions raised by these exceptions.