2012 VT 89

# In re Joint Petition of Green Mountain Power Corporation, Vermont Electric Cooperative, Inc., Vermont Electric Power Company, Inc., et al.

[60 A.3d 654]

Nos. 11-277, 11-366 & 11-367

Present: Reiber, C.J., Dooley and Skoglund, JJ., and Eaton and Zonay, Supr. JJ., Specially Assigned

Opinion Filed October 19, 2012

*Brice Simon* of *Breton & Simon, PLC*, Stowe, for Appellant Lowell Mountains Group, Inc.

*Jared M. Margolis*, Jericho, for Appellants Towns of Albany and Craftsbury.

*William H. Sorrell*, Attorney General, and *Gavin J. Boyles*, Assistant Attorney General, Montpelier, for Appellee Agency of Natural Resources.

*Peter H. Zamore* and *Charlotte B. Ancel* of *Sheehey Furlong & Behm P.C.*, Burlington, for Appellees Green Mountain Power Corporation, Vermont Electric Cooperative, Inc., Vermont Electric Power Company, Inc. and Vermont Transco LLC.

¶ 1. **Reiber, C.J.** In these appeals, the Lowell Mountains Group, Inc. (LMG) and the Towns of Albany and Craftsbury challenge several Public Service Board orders related to the construction of a wind-electric-generation facility and associated facilities on Lowell Mountain in Lowell, Vermont.[1] We affirm the Board's orders.

¶ 2. The record indicates the following. In May 2010, petitioners Green Mountain Power Corporation (GMP), Vermont Electric Cooperative, Inc. (VEC), and Vermont Electric Power Company, Inc. and Vermont Transco LLC (VELCO)[2] requested a certificate of public good (CPG) under 30 V.S.A. § 248 to construct a wind-electric-generation facility on Lowell Mountain. The proposed project consisted of up to twenty-one wind turbines and associated transmission and interconnection facilities. The turbines, each of which is expected to be over 400 feet tall, are to be sited along the Lowell Mountain ridgeline.

¶ 3. On May 31, 2011, following four rounds of prefiled testimony, several site visits, a public hearing, and nine days of technical hearings involving over forty expert and lay witnesses, the Board issued a 179-page final order granting a CPG subject to forty-five conditions. Generally speaking, the Board found that the project, consistent with the expressed intent of the Legislature, would help meet the region's need for renewable energy, provide an economic benefit to the state in the form of jobs and tax revenues, and provide GMP and VEC with a long-term source of stably priced power. The Board explained that it had approved the project based on these economic benefits and because the addition of a renewable source of power in the region was consistent with the state's legislated policy goals.

¶ 4. In reaching its decision, the Board recognized that the project could have significant impacts. It noted that GMP had

---

[1] LMG filed a separate brief in Docket Number 2011-277, but its claims of error are similar to those raised in the Towns' brief in that docket. Only the Towns have submitted a brief in Docket Numbers 2011-366 and 2011-367. For the sake of simplicity, we will generally refer to "the Towns" when discussing arguments made by appellants LMG and the Towns.

[2] Again, for the sake of simplicity, we refer to petitioners as "GMP" when discussing the arguments raised in this appeal.

entered into a Memorandum of Understanding (MOU) with the Vermont Agency of Natural Resources (ANR) to mitigate impacts with respect to habitat fragmentation, necessary wildlife habitat, and state-significant natural communities. The Board expressly conditioned its approval of the project on GMP's compliance with the MOU, which, among other things, required GMP to secure conservation easements on four identified parcels of land adjoining the project area. With respect to noise, the Board required GMP to meet specific standards to ensure that any noise remained at levels consistent with the World Health Organization (WHO) and Environmental Protection Agency guidelines.

¶ 5. For these and numerous other reasons set forth in detail in the Board's order, the Board found that, as conditioned, the project's benefits outweighed any adverse impacts and its construction and operation would promote the general good. Accordingly, it issued a CPG. Appellants and several other parties moved for reconsideration. On July 12, 2011, the Board modified its final order in certain respects, including granting GMP's request to extend the deadline for obtaining conservation easements. In Docket Number 2011-277, the Towns and LMG appeal the final order with modifications.

¶ 6. Shortly after filing their initial appeal, the Towns and LMG moved to stay and clarify the final order. The Board denied those motions on September 6, 2011. Prior to the issuance of this order, the Towns filed a motion to revoke the CPG, and LMG filed a motion for reconsideration. The Towns asserted that the project was no longer viable because GMP had failed to commence construction by the August 1 deadline set forth in the Board's final order, thereby jeopardizing federal tax credits that the Board had found enhanced the economic viability of the project. These motions were denied on October 3, 2011. The Towns appeal the October 3 order in Docket No. 2011-367.

¶ 7. In response to notice from GMP of unauthorized work performed by the owner of the parcels on which GMP was to obtain easements pursuant to the MOU, the Board issued a compliance order on August 11, 2011. The owner had undertaken earthwork and logging activities on three of the four parcels.[3] The Board's order required GMP to remediate and mitigate the impacts of those activities. Later that month, in response to the

---

[3] Activity on only two of the four parcels is at issue in this appeal.

August 11 order, GMP filed a report stating that it had completed the required remediation and mitigation with respect to the easement parcels. ANR submitted a letter stating that GMP's remediation and mitigation was adequate to comply with an order ANR had issued pursuant to 10 V.S.A. § 1272 in response to the unauthorized work. For their part, the Towns submitted filings contending that the remediation and mitigation was inadequate and requesting a hearing on the issue. On August 31, 2011, the Board, in a 2-1 decision, concluded that GMP's remediation and mitigation was sufficient. The Board concluded that the Towns had failed to raise a significant issue warranting a technical hearing on the matter. The Towns appeal the August 31, 2011 order in Docket Number 2011-366.

¶ 8. Our review of the Board's decisions is limited. As we have explained:

> When the Board evaluates a petition for a CPG under 30 V.S.A. § 248, it is engaging in a legislative, policy-making process. The Board must exercise its discretion to weigh alternatives presented to it, utilizing its particular expertise and informed judgment. We give great deference to the Board's expertise and judgment and accord a strong presumption of validity to the Board's orders. We will affirm the Board's findings unless they are clearly erroneous, and an appellant bears a heavy burden of demonstrating clear error.

*In re UPC Vt. Wind, LLC*, 2009 VT 19, ¶ 2, 185 Vt. 296, 969 A.2d 144 (quotations and citations omitted). Our deference extends to the whole of the Board's CPG decision, and we reject the Towns' assertion that we should not defer to the Board with respect to certain issues addressed in its decision, such as habitat fragmentation.

## I. Docket Number 2011-277

### A. Noise

¶ 9. We first consider the Towns' challenge to the Board's finding that the proposed project complies with noise standards necessary to protect public health. According to the Towns, the Board's finding is erroneous because GMP's noise modeling shows that the applicable noise standards will not be met.

¶ 10. We begin with the Board's findings regarding noise levels, several of which the Towns claim are clearly erroneous. The Board concluded that the proposed project would not have an undue adverse impact with respect to noise provided that GMP complied with certain conditions, including an absolute noise standard. The Board set the noise standard at 45 dBA (exterior) (Leq) (1 hr) and 30 dBA (interior bedrooms) (Leq) (1 hr).[4] It found this standard sufficient to protect human health and avoid sleep disturbance and equivalent to, if not more stringent than, the 2009 WHO Guidelines.

¶ 11. GMP conducted noise modeling on the four models of wind turbines being considered for the proposed project using standards related to the attenuation of sound propagation outdoors as specified by the International Organization for Standardization 9613-2, and as implemented in the Cadna/A acoustical modeling software, an internationally accepted and widely used acoustical model. This modeling showed that the project was expected to meet the noise standard of 45 dBA (exterior) (Leq) (1 hr) at nearby residences, with two of the proposed turbine models requiring a noise-reduced-operation (NRO) mode to meet the standard. The project would also meet the 30 dBA (interior bedrooms) (Leq) (1 hr) standard factoring in attenuation by structures.

¶ 12. The Board explicitly stated that if noise from the operation of the proposed project exceeded the maximum allowable levels, GMP was required to take all remedial steps necessary to bring the sound levels into compliance, including modification or cessation of turbine operation. As part of its order, the Board also directed petitioners to prepare a noise-monitoring plan subject to the parties' review and the Board's approval. This plan was required to be in place from the commencement of construction through the first two years of operations and to include, among other things: (1) a monitoring program to confirm under a variety of seasonal and climactic conditions compliance with the maximum allowable sound levels; (2) a means for ensuring that noise

---

[4] As the Board explained, noise levels can be described in terms of continuous equivalent sound level ("Leq"). The Leq is the average of the sound pressure over an entire monitoring period and expressed as a decibel ("dBA"). The monitoring period can be for any amount of time. A 30 dBA level is characterized as a faint noise, below the level typically found in a library (38 dBA) and background noises in a home (40 dBA).

monitoring events were timed to coincide with those time periods when GMP's modeling indicated the likelihood that the NRO mode would be triggered; (3) compilation of monitoring reports that documented every instance when the NRO mode was triggered, with a description of how the NRO mode affected operations; (4) provision of monitoring, at the request of a homeowner, to ensure compliance with the interior noise standard; and (5) a process for complaint resolution for the entire life of the project. Many of these requirements were imposed in response to concerns raised by the Towns.

¶ 13. In reaching its conclusion, the Board considered the Towns' arguments that GMP's noise modeling was inaccurate and that it did not show that the proposed project, as currently designed, would meet a 45 dBA exterior standard. The Towns also asserted that GMP unjustifiably relied on a 15 dBA attenuation by structures to ensure that a 30 dBA interior standard was met. They claimed, moreover, that the NRO mode had not been demonstrated to work for the proposed project and that the proposed turbines were not selected to minimize noise. According to the Towns, GMP should have been required to select turbines to meet the standard without the use of an NRO mode to provide a margin of error for meeting the standard and in case the noise modeling for the proposed project was incorrect.

¶ 14. The Board rejected these arguments. It recognized that noise from the proposed project would likely be audible at residences surrounding the project but concluded that the imposition of absolute standards with regard to noise levels at the nearest receptor locations would appropriately ensure that these areas were not unduly impacted. The Board found it unnecessary to restrict GMP's use of certain turbine models, again noting that the proposed project was required to meet an absolute noise standard.

¶ 15. As to the attenuation claim, the Board found that the WHO Guidelines indicated that sound levels were usually reduced by 10 to 15 dBA when windows were slightly open, and with windows closed were typically reduced by somewhat less than 24 dBA and in certain cases as much as 45 dBA, depending on the building's insulation value. The Board found GMP's assumptions about attenuation consistent with values in the WHO Guidelines, and its noise modeling appropriate. The Board also noted that its order required GMP to comply with the indoor standard of 30

dBA (interior bedrooms) (Leq) (1 hr), regardless of the attenuation characteristics of the existing structure.

¶ 16. Based on these and numerous other findings, the Board concluded that, with the conditions imposed by its order, the project's noise levels would not have an undue adverse impact on public health or aesthetics. The Board reiterated its rejection of the Towns' arguments in its order on reconsideration.

¶ 17. The Towns argue on appeal that the Board erred in reaching its conclusion. They assert that GMP ignored the confidence intervals set forth in the modeling protocols, which renders the results of the modeling unreliable and requires that the results be adjusted by several decibels to provide a true "worst-case" scenario. The Towns maintain that the Board acted arbitrarily and capriciously by failing to directly address this issue, and they suggest that the Board's findings are insufficient to allow this Court to determine how the Board reached its conclusion. The Towns also complain that GMP's reliance on 15 dBA of attenuation by structures is insufficient under the WHO Guidelines, and they fault GMP for failing to conduct preconstruction turbulence monitoring. According to the Towns, allowing a project that has not shown, at the outset, that it can meet a necessary health standard is clearly erroneous and inconsistent with the Board's mandate under 30 V.S.A. § 248, and thus cannot be in the public good.

¶ 18. We reject these arguments. As the Board emphasized in its decision, it has imposed absolute noise standards with which GMP must comply. It has also required the implementation of a comprehensive noise-monitoring plan. To the extent that a truly "worst-case" scenario based on the confidence intervals comes to pass, that problem can and must be rectified. We agree with GMP that the Board's operating conditions effectively ensure that the project will comply with the Board's sound standard, regardless of the precise accuracy of the noise-level estimates in the testimony. It is the actual noise levels once the project is in operation that will control, not the estimates provided by GMP during the approval proceeding. The Board adequately explained its decision, and its decision is supported by the record.

¶ 19. As to attenuation by structures, the Towns complain that GMP erred in assuming a full 15 dBA of attenuation because WHO assumes only a 10-15 dBA attenuation, and then only for

windows "slightly open." They maintain that homeowners should be allowed to sleep with their windows fully open or even sleep outside their homes without suffering undue adverse health impacts from noise. They assert that the results of GMP's noise modeling indicate that 10 dBA of attenuation is insufficient to meet the 30 dBA interior noise standard and that the project therefore poses an undue adverse risk to public health.

¶ 20. The Board acknowledged the Towns' arguments concerning attenuation, and it rejected them. It specifically found GMP's attenuation assumptions to be consistent with WHO Guidelines. We agree. In fact, the Guidelines upon which the Board relied use an average of a 21 dBA difference between outside and inside values, taking into account that even in well-insulated houses windows may be open a large part of the year. Additionally, as the Board repeatedly stated, it has imposed absolute noise levels. To the extent that the 30 dBA standard is not met, the problem will be rectified. As the Board made clear, "[t]he project must meet the Board-imposed standard or the petitioners will have to make operational adjustments to ensure that it does. Failure to meet the standard will be a violation of the CPG governing operation of the project."

¶ 21. For the same reason, we reject the Towns' contention that the Board erred by failing to require GMP to conduct preconstruction turbulence modeling. The Towns state that because the Board acknowledged in an unrelated case that turbulence had the potential to increase noise levels, it was clearly erroneous for the Board to find that this project would meet the noise standard absent preconstruction turbulence modeling to ensure that all potential noise sources were accounted for in the analysis. The Towns also argue that this was a "generally available mitigating step" that GMP failed to take. They claim that the Board failed to discuss this issue, thereby rendering its decision clearly erroneous.

¶ 22. The Towns assert that they preserved this argument by raising it in their initial brief and reply brief below. They provide no pinpoint cites to support this assertion, however, and fail to show precisely where, for example, in their 112-page initial brief this issue was raised. It is the Towns' burden to show how an issue is preserved, and they failed to meet that burden here. See *In re S.B.L.*, 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988)

(stating that appellant bears burden of demonstrating how trial court erred warranting reversal and Supreme Court will not comb record searching for error); see also V.R.A.P. 28(a)(4) (providing that appellant's brief should explain what issues are, how they were preserved, and what appellant's contentions are on appeal, with citations to authorities, statutes, and parts of record relied on).

¶ 23. In any event, this argument fails for the same reason as those above. The Board imposed an absolute noise standard with which GMP must comply. This ensures that there will not be "excessive" noise from turbulence or from any other source. We reject the argument that GMP was required to conduct such modeling before reaching its conclusion that the noise impacts were not undue. In a similar vein, the fact that such modeling was not conducted does not show that GMP failed to take a generally available mitigating step. In sum, we reject the Towns' argument that the Board's findings on the noise issue are insufficient to allow this Court to determine what was decided and why.

## B. Turbines

¶ 24. The Towns next argue that the Board erroneously approved wind turbines that are prohibited by its order. According to the Towns, the Board approved the project for up to only a 63 MW wind electric generation facility, yet petitioners have informed the Board that they will be using 21 Vestas V112 turbines for the project, which have a rated output of 3.075 MW rather than 3.0 MW. This results in a 64.575 MW wind-generation facility rather than a 63 MW facility.

¶ 25. The Board considered and rejected this argument, as do we. The record indicates that in its CPG decision the Board reviewed four possible turbine models, including the Vestas V112-3.0 MW that GMP ultimately selected. The Board determined that the project would comply with 30 V.S.A. § 248 if any of the proposed turbines were used. GMP submitted its final design plans for the Board's review, and the Board approved GMP's turbine selection in a July 19, 2011 order.

¶ 26. In the meantime, the Towns filed a letter with the Board on July 12, 2011 arguing that GMP was prohibited from constructing the wind electric generating facility utilizing twenty-one Vestas V112-3.0 MW turbines because the Board's order approving the project stated that GMP was authorized to construct "up to a

63 MW project." The Towns argued that GMP must install only twenty of the V112 model turbines, select a different turbine, or obtain an amendment to the CPG. GMP responded to these arguments, and the Towns replied to this response.

¶ 27. The Board rejected the Towns' arguments in a July 20, 2011 memorandum to the parties. First, it noted that no party had properly presented a motion seeking any particular relief from the Board. Additionally, the Board explained that it had specifically considered and approved the construction of up to twenty-one of the V112 turbines in its May 2011 CPG. Therefore, the Board reasoned, to the extent that it was possible to read certain language in that order as placing a 63 MW restriction on the project, the Board considered such a restriction to be a technical error. Lastly, the Board stated that even if its order had imposed a 63 MW limit, the change from a 63 MW to 64.575 MW would not represent a substantial change requiring an amendment to the CPG under the Board's rules.[5]

▪ ¶ 28. The Board identified reasonable grounds for its decision and acted well within its discretion in classifying this as a technical error. It is readily apparent from the Board's order that it approved up to a twenty-one turbine wind-generation facility and that it expressly approved the particular turbine model selected by GMP. We find no error.

### C. State-Significant Natural Communities

¶ 29. The Towns next argue that the project will have an undue adverse impact on the natural environment due to the loss of state-significant natural communities. They maintain that the Board erred in finding that the MOU would limit the impacts of clearing to being adverse in nature rather than unduly adverse. According to the Towns, ANR's expert, Eric Sorenson, specifically testified that not only was the loss of these areas of state-significant natural communities an undue adverse impact but the MOU would not mitigate this impact.

---

[5] LMG argues that because even small-capacity projects involving less than 1.5 MW of power are required to meet the requirements of 30 V.S.A. § 248, the Board erred by considering the change from 63 MW to 64.574 MW to be insubstantial. The fact that small-capacity projects involving a small amount of power must be reviewed does not necessarily mean that a change of roughly 2.5% in the amount of permitted power in a large project is substantial.

¶ 30. The Towns misconstrue the testimony at issue. The Board clarified its discussion of these significant natural communities in its July 12, 2011 order in response to ANR's request. It found that the two montane forest natural communities were uncommon in the state, but that they were not rare. Therefore, the Board was not required to find that there would be no undue adverse impact to these communities pursuant to 10 V.S.A. § 6086(a)(8) in order to issue a CPG for the proposed project. Nevertheless, the Board was required under 30 V.S.A. § 248(b)(5) to find that the proposed project would not have an undue adverse effect on the natural environment, including the montane forests. The Board found that the mitigation and decommissioning measures provided by the MOU would limit the impacts of clearing to being adverse in nature, rather than unduly adverse.

¶ 31. The Board's finding is supported by the record. While it is true that at the time of his prefiled testimony Mr. Sorenson believed that the impacts to these forests would be unduly adverse, he also maintained that there were mitigating steps that could be taken to change this result. The MOU was entered into after Mr. Sorenson's prefiled testimony. In his live testimony before the Board, Mr. Sorenson addressed the MOU and testified that the project's effects on the two state-significant forest types had been mitigated such that they were adverse but not unduly so. The Board's finding on this point is therefore supported by the record.

### D. Habitat Connectivity Easements

¶ 32. The Towns' final argument in Docket Number 2011-277 is that the Board erred by considering and granting GMP's motion following issuance of the CPG to extend the deadline for GMP to obtain easements to mitigate fragmentation caused by the project. In its initial order, the Board found that absent the mitigation proposed and agreed to by ANR and GMP in the MOU, the proposed project would have an undue adverse effect on natural communities and the natural environment as a result of the habitat fragmenting effects of the project. It recounted that ANR had agreed to work in good faith with GMP on all of the requirements of the MOU and that paragraph 3.2 of the MOU required GMP to secure fragmentation-connectivity easements before commencing commercial operation of the proposed project.

¶ 33. The Board modified this deadline to require that such easements be secured prior to construction rather than the start of commercial operations. It found that during the technical hearings it had been established that under certain scenarios GMP might not be able to secure easements of adequate size and location. Thus, pursuant to the MOU, GMP might spend significant amounts of money to construct the proposed project, and in so doing, fragment the on-site habitat yet not be able to operate the project because adequate habitat had not been conserved.

¶ 34. The Board explained that only with secured adequate fragmentation-connectivity easements in place before the commencement of construction could it find that the project would not have undue adverse impacts on wildlife habitat due to fragmentation. It therefore required petitioners to secure prudent fragmentation-connectivity easements of adequate size and location, pursuant to the requirements of paragraph 3.2 of the MOU, and file them for Board approval before commencing construction.

¶ 35. In its motion for reconsideration, GMP asked the Board to modify its deadline for securing these easements to the start of commercial operations. It argued in part that its ability to obtain the easements prior to construction was largely beyond its control and that a preconstruction deadline would have the unintended consequence of delaying construction to the point where federal tax credits would be jeopardized.

¶ 36. The Towns opposed GMP's request, raising both procedural and substantive concerns. The Towns first maintained that reconsideration was inappropriate because the Board was not rectifying its own error and GMP had failed to raise the easement-timing issue in its reply brief in response to the Towns' position. The Towns also asserted that a preconstruction deadline was necessary to avoid undue impacts to wildlife habitat because fragmentation would occur when construction commenced, and there was no guarantee that adequate parcels could be obtained. In the Towns' view, any timing issues were entirely of GMP's own making because the utility had been aware of the need to be operational by a certain date to avoid losing the federal tax credits. Finally, the Towns argued that modification of the easement deadline would have an undue adverse impact on wildlife habitat for an undetermined period of time and that the loss of the tax credits was unrelated to the condition at issue and should therefore be disregarded by the Board.

¶ 37. In response to GMP's motion for reconsideration, ANR proposed that the preconstruction deadline be modified to require GMP to obtain the easements on or before December 31, 2011 rather than prior to the commencement of commercial operations. ANR asserted that this would ensure that the easements were in place during the first phase of construction. ANR also recommended that the Board direct that if the easements were not obtained by December 31, 2011, all construction activities would cease until the easements were obtained and approved. GMP agreed to ANR's proposal.

¶ 38. The Board amended its final order to incorporate, with a slight modification, the changes recommended by ANR. As an initial matter, the Board rejected the Towns' assertion that it lacked authority to address this issue on reconsideration under Vermont Rule of Civil Procedure 59(e). The Board stated that it had been unaware that the imposition of a preconstruction deadline would delay the commencement of construction and place the economic viability of the project at risk due to the potential loss of the federal tax credits. Given this, the Board concluded that the imposition of the condition had created an unintended consequence, making the issue appropriate for reconsideration.

¶ 39. Moreover, the Board was not persuaded by the Towns' assertion that GMP's failure to raise this issue in its reply brief prohibited it from reconsidering the issue. It found that GMP had raised the issue — and thus the Board was aware of GMP's position — through inclusion of a preoperations deadline in the MOU. The Board reiterated that it had not known, and that GMP had previously been unable to call its attention to, the practical impossibility of complying with the condition while maintaining the economic viability of the project. Accordingly, the Board found the matter properly before it.

¶ 40. With respect to the deadline itself, the Board was persuaded by GMP's arguments and ANR's apparent support for the amended deadline. The Board explained that its primary concern in imposing the preconstruction deadline had been that GMP might delay meeting its obligation until just before commercial operations began, when it could find itself with little or no options if parcels that it had previously identified turned out to be unavailable. It found, however, that GMP had been working steadily since signing the MOU to obtain the required easements and that it appeared to be making progress.

¶ 41. The Board concluded that the December 31, 2011 deadline, coupled with the requirement that GMP cease construction if the easements were not approved by that date, gave GMP adequate time to either obtain the identified potential easements or work with ANR under the MOU to identify and obtain alternate parcels. The Board further concluded that the risk of financial exposure would be limited by establishing the deadline at a time relatively early in the construction process.

¶ 42. The Board agreed with the Towns that the fragmentation effects would begin at the time that GMP entered the area and began clearing activities in preparation for road and crane-path construction. It found, however, that the parcels being pursued to mitigate the fragmenting impacts of the project were close to, but not actually on, the project site. The parcels were undeveloped, and the Board found that the commencement of construction prior to their conveyance would not have an impact on their undeveloped nature. Accordingly, the Board found that allowing construction to commence while imposing a short deadline for obtaining the requisite easement rights would neither exacerbate the fragmentation effects of the project nor compromise the mitigation value of the undeveloped parcels.

¶ 43. The Board also noted that ANR, the state agency charged with protecting the state's natural resources, had entered into the MOU with GMP to address the habitat fragmentation impacts of the project by requiring GMP to obtain habitat fragmentation-connectivity easements. Additionally, ANR (through the MOU) had been agreeable to allowing construction to commence before GMP obtained the necessary mitigation parcels, which suggested to the Board that ANR believed sufficient mitigation could be obtained by GMP in this proceeding. The Board further noted that parcels meeting the MOU objectives had already been identified and that discussions with the landowners were underway.

¶ 44. The Board recognized the risk that GMP would be unable to obtain adequate mitigation by December 31, 2011. Nonetheless, it believed that the risk was sufficiently minimized by the steps it was taking in its decision. The Board also indicated that it had found that the wind energy project, subject to certain conditions, would promote the general good of the state. That finding was based, in part, on the state's legislated policy goal of promoting the construction of renewable resource generating facilities. The Board reasoned that its decision minimized potential risks and

avoided an unintended consequence that would run counter to those legislated policy goals. In short, the Board concluded that the impacts of the project would not be unduly adverse as long as adequate mitigation was obtained, even if the deadline for obtaining mitigation was extended as requested by GMP and approved by ANR.

¶ 45. The Board revisited this issue in denying the Towns' motion for a stay pending appeal. In their stay request, the Towns again argued that the Board lacked the authority to consider GMP's request for reconsideration. They also pointed to GMP's admission that it knew as early as February 2011 that obtaining the easements preconstruction might be problematic.

¶ 46. The Board denied the Towns' motion while acknowledging that, given GMP's February 2011 admission, GMP should have raised the issue of the potential loss of federal tax credits earlier. Nonetheless, the Board found that GMP's failure to do so did not preclude it from reconsidering the easement deadline.

¶ 47. Noting that Rule 59(e) represented a codification of a trial court's inherent discretionary power to open and correct, modify, or vacate its judgments, the Board asserted that it could examine the correctness of any issue in the record, even issues not raised by the parties in their Rule 59(e) motions. Moreover, according to the Board, the nature of a § 248 decision reinforced its discretion to reconsider the easement deadline. As the Board stated, the ultimate question in such proceedings is whether a proposed project will promote the general good of the state. Interpreting Rule 59(e) to preclude reconsideration of a decision that would otherwise result in unintended consequences and possibly lead to the demise of a project that had been determined to be consistent with the public good would be counter to the purpose of § 248 proceedings.

¶ 48. The Board also rejected the Towns' assertion that it had improperly considered GMP's economic interests in deciding whether to amend the easement deadline. According to the Towns, the plain language of § 248 did not allow the Board to balance GMP's economic interests against the potential for undue adverse impacts to the natural environment. The Board found that the Towns misunderstood the basis of its decision to extend the easement deadline. It explained that the decision was unrelated to GMP's profitability but rather directly related to promoting the general good of the state. The Board reiterated why it had found

the project to serve the public good. The Board noted that project construction needed to begin by August 2011 to ensure access to federal tax credits and that delaying commencement of construction would create the potential for loss of the tax credits, thereby creating a risk to the economic viability of the project. As the Board stated, the potential threat to the viability of a project found to promote the general good of the state "provided the context" in which the Board considered moving the deadline for obtaining the easements.

¶ 49. On appeal, the Towns assert that the basis for the Board's decision to accept and rule on GMP's motion was clearly erroneous because the Board relied upon GMP's misrepresentations regarding its lack of awareness at the time it submitted its reply brief that a preconstruction deadline for obtaining mitigation could delay the project. According to the Towns, the Board did not have inherent power to rule on GMP's reconsideration motion because the Board's inherent power is limited to correcting mistakes in the record.

¶ 50. The Towns also reassert their argument that the Board erroneously altered the easement deadline based on economic concerns. According to the Towns, the Board extended the deadline for mitigation based on GMP's need to commence construction by August 1 to qualify for federal tax credits, not based on natural-resource impacts. Thus, the Towns maintain that the Board's decision improperly balanced GMP's economic concerns with the need to ensure that no undue adverse impact to the natural environment would result from the project. The Towns also assert that the Board's reasoning is inconsistent with its finding that the project cannot obtain the tax credits if construction is not commenced by August 1 and with its earlier ruling that the tax credits do not implicate § 248 criteria because they are not related to the economic benefits of the project.

■ ■ ¶ 51. We reject these arguments. We first address the Board's authority to consider GMP's request on reconsideration. We conclude that the Board acted within its discretion in considering GMP's motion. We recently reiterated that Rule 59(e) "gives the court broad power to alter or amend a judgment," and that the rule may be invoked "to support reconsideration of matters properly encompassed in a decision on the merits." *In re SP Land Co.*, 2011 VT 104, ¶ 16, 190 Vt. 418, 35 A.3d 1007 (quotations omitted). As we stated in *SP Land Co.*:

Under this rule, the court may reconsider issues previously before it, and generally may examine the correctness of the judgment itself. That is, Rule 59(e) codified the trial court's inherent power to open and correct, modify, or vacate its judgments. The trial court enjoys considerable discretion in deciding whether to grant such a motion to amend or alter.

Indeed, we have held that the court's power on a Rule 59(e) motion even extends to issues not raised in the motion.

*Id.* ¶¶ 16-17 (quotations· and citations omitted).

 ¶ 52. Here, regardless of the timing of GMP's awareness of the potential for a preconstruction deadline to delay the project, the Board had the authority, within the confines of GMP's Rule 59(e) motion, to address the correctness of its judgment. *Id.* ¶ 19 (reiterating "our longstanding view that Rule 59(e) affords trial courts the broad power to generally examine the correctness of a judgment itself"). In response to a Rule 59(e) motion, the trial court has the power to make an appropriate modification or amendment, including with respect to issues considered at trial but not raised in the Rule 59 motion. This approach strikes "an appropriate balance between reconsideration and finality." *Id.* ¶ 17 (quotation omitted). Hence, it was proper for the Board to reconsider an issue that had been previously before it during the proceedings on the merits of the proposed project. See *In re Robinson/Keir P'ship*, 154 Vt. 50, 54, 573 A.2d 1188, 1190 (1990) (stating that Rule 59(e) allows trial court to examine correctness of judgment and reconsider issues previously before it).

¶ 53. The Towns' remaining arguments concerning the Board's extension of the deadline for GMP to obtain easements are unavailing. As the Board pointed out, it did not find that GMP would be unable to obtain federal tax credits if it did not commence construction by August 1; rather, it found that the potential for obtaining the credits would be threatened if construction were not commenced by that date. Thus, the record does not demonstrate that the tax credits were no longer available, and there is no conflict with the Board's extension of the deadline for obtaining mitigation easements.

¶ 54. The Towns concede that the Board may weigh aesthetic and economic considerations of a project, and the Board unequivo-

cally stated that in extending the deadline for obtaining easements it was balancing the potential risk of harm caused by the extension against the risk that not extending the deadline would imperil the financial viability of a project found to benefit the public. Noting that tax credits to GMP would ultimately flow through to taxpayers, the Board weighed what it perceived as a relatively small potential risk to the natural environment posed by the delay against the potential loss of a project deemed to be beneficial to the public — not against the risk of GMP. losing profits on the project.

¶ 55. We conclude that the Board acted well within its discretion in reevaluating whether it made sense to modify the easement deadline under the circumstances. When the Board became aware that holding up the project based on GMP's inability to meet the deadline for obtaining easements could potentially threaten the viability of the project itself, it had the discretion to extend the deadline to ensure the project's viability.

## II. Docket Numbers 2011-366 and 2011-367

### A. Appeal of Board's August 31, 2011 Order Regarding Habitat Mitigation

¶ 56. In Docket Number 2011-366, the Towns challenge the Board's August 31, 2011 order regarding the sufficiency of required mitigation for habitat and other environmental impacts. Condition 15(a) of the CPG required GMP to comply with all conditions and requirements set forth in the February 24, 2011 MOU between GMP and ANR. As the Board noted in its decision, ANR is the state agency charged with protecting the state's natural resources. Among other things, ANR's MOU required GMP to secure conservation easements on four parcels of land adjoining the project to mitigate the project's impacts on black bear habitat and the fragmentation of the Lowell Mountain ridgeline. The Board found that without the MOU the project "would have an undue adverse impact on natural communities and the natural environment as a result of the fragmenting effects of the project."

¶ 57. On July 21, 2011, GMP notified the Board of its discovery that the owner of the land that was to be subject to the conservation easements had undertaken unauthorized earthwork and logging-related activities on three of the four easement

parcels. In response, on August 5, 2011, ANR issued an order pursuant to 10 V.S.A. § 1272 requiring the landowner to remediate and mitigate the impacts of the activities. The order noted that GMP had agreed to be responsible for undertaking the restoration and remediation work necessary to correct the landowner's activities.

¶ 58. On August 11, 2011, also in response to GMP's notice, the Board issued an "Order Re Compliance with Condition 15(a)" establishing a process for determining whether GMP had complied with Condition 15(a) in light of the activities and subsequent remediation efforts on the mitigation parcels. In the compliance order, the Board noted that the Towns had requested that the Board hold a technical hearing that would include sworn testimony subject to discovery and cross-examination. The Board denied the request for a technical hearing without prejudice to the Towns renewing the motion in the future.

¶ 59. The Board acknowledged that it had relied upon the mitigation conservation easements to support its conclusion that the project would have no undue adverse impact on natural resources in the area. It further stated that it had a responsibility to see that appropriate remediation and mitigation take place on those easement parcels. It emphasized that GMP had an obligation under Condition 15(a) of the CPG to comply with response requirements imposed by ANR. Considering these facts, the Board established a process for determining whether GMP's response to the unauthorized logging-related activities was adequate.

¶ 60. The post-certification review process established in the August 11 compliance order required GMP to file a detailed report describing, among other things, the impacts of the logging activities on the easement parcels, GMP's remediation of those impacts, and any supplemental mitigation to offset the unauthorized work performed by the landowner. The Board allowed all parties with standing on natural resource impacts, including the Towns, to file comments or make motions on GMP's report, but stated that any party requesting the opportunity for a technical hearing must demonstrate the need for a hearing.

¶ 61. GMP filed the required report on August 17, 2011 asserting that it had appropriately and adequately addressed ANR's requirements to remediate the work done on the parcels and detailing the remediation work it had performed. GMP also

informed the Board that it had obtained conservation easements on two new parcels, totaling 172 acres, as supplemental mitigation to offset the logging. One week later, ANR submitted to the Board a letter from one of its attorneys stating that the remediation activities required by ANR's order under 10 V.S.A. § 1272 were satisfactorily performed and that the habitation fragmentation impacts to the easement parcels were adequately offset by GMP's conservation of the two additional parcels as supplemental mitigation. That same day, in response to ANR's letter, the Board requested that ANR file "a complete explanation from a qualified expert" explaining how easements on the two new parcels offset fragmentation impacts resulting from the logging activities on the two original easement parcels. The Board asked ANR specifically to address how the conservation easements obtained for the new 172 acres provided habitat connectivity given their location on opposite sides of the construction site separated from the original easements.

¶ 62. The next day, August 25, ANR submitted a follow-up letter, in which its attorney summarized an explanation provided by its wildlife habitat expert, who had previously submitted testimony subject to cross-examination in the CPG proceedings before the certificate was issued. The letter stated that the new 172-acre easements obtained by GMP were not intended to provide habitat connectivity; that the fragmentation effects of the clearing activities on nonproject lands were not comparable to the much larger effects of the project construction and did "not create a significant level of alteration to the Lowell Mountain habitat block." The letter further stated that the new conservation easements were therefore not intended to serve the same function as the original mitigation easements required to offset connectivity fragmentation caused by the project construction.

¶ 63. Specifically, the ANR attorney reported the wildlife habitat expert's opinion that: (1) the activities on the two parcels, "while viewed as temporary, are not insignificant and are not easily or quickly remedied"; (2) however, "the impact of the clearing activities are limited in scale when compared to the impact of the construction of the wind facility on the Lowell mountain ridgeline" in that "the fragmenting effects of the wind facility which are large and permanent are incomparable to the effects of [the] recent clearing and road construction"; (3) "[w]hile there is no practical way to unfragment the forest canopy" of the easement

parcels, GMP had agreed to place additional restrictions on the original mitigation easements where the unauthorized work was performed and to "ensure proper stewardship of the land through new conservation easements" on the additional 172 acres; (4) regarding the habitat connectivity, the new parcels "are not intended to serve the same function as the connectivity easements required by the Natural Resources MOU"; (5) rather, the new parcels were "intended to offset the recent fragmentation" resulting from the logging activities; (6) the "landscape level" alteration resulting from construction of the wind facility was the basis for ANR's request for connectivity easements, but the recent logging on the easement parcels "did not result in the same degree of impact to habitat connectivity nor create a significant level of alteration to the Lowell Mountain habitat block"; and (7) "when viewed in the context of the project as a whole," permanent conservation easements on the two new parcels totaling 172 acres "provides the most realistic and reasonable means to mitigate the impact of the recent clearing, and when viewed in that context, results in greater protection for wildlife within the habitat block than originally proposed in the Board's final order."

¶ 64. On August 29, the Towns' attorney filed a letter with the Board responding to ANR's August 25 letter. The Towns asserted that neither ANR nor GMP had demonstrated that GMP's remediation and supplemental mitigation efforts were adequate to offset impacts from the logging-related activities on the original easement parcels. According to the Towns, the Board must conclude, based on the statements made in ANR's letter, that the logging activities caused fragmentation of the two easement parcels and that neither GMP's remediation efforts nor its new conservation easements offset that fragmentation, thereby compelling the conclusion that the Lowell project posed an undue adverse effect on the natural environment.

¶ 65. On August 31, 2011, the Board issued an order finding that GMP's remediation efforts and proposed supplemental mitigation adequately addressed the impacts resulting from the unauthorized work on the easement parcels. The Board found that, despite the temporary impacts, the remediation efforts involving narrowing, stabilizing, and re-vegetating the cleared corridor "will ensure that there will be no permanent fragmentation effects" and will restore the parcels' water quality functions. The Board further found that the supplemental mitigation — placing an additional 172 acres

under permanent conservation easements — would adequately offset the impacts of "temporary gaps in the forest canopy" caused by clearing approximately twelve acres of land on the original mitigation easement parcels. In short, the Board agreed with the Towns that although the impacts of the work on the easement parcels "will not be fully eliminated until the canopy has regrown over a period of time, these impacts are nonetheless temporary and adequately offset by the permanent conservation of an additional 172 acres on terms more restrictive than those covering Parcels 1 and 2."

¶ 66. In making this determination, the Board stressed that the impacts from the logging on the two parcels were "limited in nature and do not create the need for connectivity easements in the manner that project construction does." As the Board explained:

> [I]t was the landscape level scale of fragmentation that would result from the project construction that gave rise to the need for connectivity easements. The limited nature of the impacts to Parcels 1 and 2 does not require the same remedy, and conserving more land in the immediate area, and increasing the restrictions on the previously identified Parcels 1 through 4, will adequately compensate for the temporary impacts to Parcels 1 and 2.

¶ 67. Thus, based on undisputed facts concerning the nature and scope of the work performed by the owner on the mitigation parcels, the Board concluded that although the original four easements were intended in part to address issues concerning fragmentation and the loss of connectivity caused by the Lowell project, this did not mean that the logging and resulting temporary loss of connectivity on the easement properties themselves negated the value and function of the mitigation easements in connection with the project and specifically Condition 15(a). As the Board made clear, even though the additional easements obtained by GMP as supplemental mitigation following the unauthorized work on the original easements "were not intended to provide connectivity," the placement of more land under conservation resulted in "a greater degree of wildlife protection than the Mitigation parcels by themselves as contemplated in the Natural Resource MOU."

¶ 68. The Board also addressed the Towns' argument that due process demanded a technical hearing on whether GMP's remediation and supplemental mitigation had adequately addressed the impacts of logging on the two easement parcels so that GMP was still in compliance with Condition 15(a) of the CPG.[6] The Board first noted that it was dealing with a post-certification compliance issue, which does not require the same level of process as the initial proceedings concerning a CPG petition. See *In re Vt. Elec. Power Co.*, 131 Vt. 427, 434-36, 306 A.2d 687, 691-92 (1973) (rejecting challenge to process whereby Board granted CPG with respect to general route of transmission lines but reserved post-certification review of specific route, at which time parties would have opportunity to comment and further hearing would "not [be] precluded should a comment be made which warrants a hearing"); see also *In re UPC Vt. Wind, LLC*, 2009 VT 19, ¶ 10 (citing *Vermont Electric Power Co.* in concluding that Board "acted within its discretion in using post-certification proceedings to evaluate . . . compliance with the conditions imposed").

¶ 69. According to the Board, "it is an accepted procedure" for post-certification compliance filings such as these "to afford the parties an opportunity to comment and request a hearing on the filings, with the Board then scheduling a hearing if any party demonstrates that the filings raise a substantial issue that requires a hearing or if the Board in its discretion deems a hearing is merited." See *Vt. Elec. Power Co.*, 131 Vt. at 435, 306 A.2d at 692 ("By attacking the post-certification procedure employed by the Board, the appellants ignore the fact that it is an accepted practice of the Board and administrative tribunals generally."). The Board also stated that it was not unusual for it to rely upon experts in assessing compliance with conditions of approval during post-certification reviews.

¶ 70. The Board then set forth the basis for its decision to deny the Towns' request for a technical hearing on whether Condition 15(a) was satisfied in light of the logging activities and follow-up remediation and mitigation concerning the two easement parcels. The Board noted that, consistent with the process it had set forth

---

[6] Apparently, it is undisputed that the work on the easement parcels was done without GMP's knowledge. From that perspective, it is unclear if or how GMP violated Condition 15(a).

in its August 11, 2011 compliance order, it had given each of the parties an opportunity to submit comments on the issues and had considered comments from GMP and its expert, the Towns and their expert, and ANR stating the view of its expert. The Board found ANR's comments, referenced above, "to be the most reliable and persuasive."

¶ 71. Observing that the impact of the clearing activities on two of the original easement parcels related more to water quality than anything else, the Board stated that the expert who submitted comments on behalf of the Towns had "only limited experience" with respect to the issues before it. The expert indicated to the Board that he had been a professional tree feller for only two years from 1974 to 1976 and that he had been appointed to the Vermont Fish and Wildlife Board in 2011. He represented to the Board that he had read extensively on the impacts of tree clearing and other development on wetlands and other natural resources.

¶ 72. The Board concluded that his representations were insufficient to warrant reliance on his opinion, noting that his affidavit provided no details on the reading he had done or on the type of tree-felling activities in which he had participated. The Board further noted that there was no indication he had ever published a paper on the issues before it or been qualified as an expert in proceedings addressing similar issues. Ultimately, after considering all of the parties' comments, the Board concluded that the Towns had "failed to raise a significant issue that warrants additional process or hearings." The Board based this conclusion on the "little weight" it gave to the opinion submitted by the Towns' expert — especially compared to the impressive experience of ANR's expert, whose credentials were well known to the Board from prior proceedings. One Board member dissented. Emphasizing that he did not necessarily disagree with the result reached by the Board, he stated nonetheless that the Board should not decide the adequacy of GMP's remediation actions and proposed mitigation without first giving the Towns and LMG an opportunity to cross-examine ANR's expert.

¶ 73. The Towns argue on appeal that the process afforded by the Board on the question of whether Condition 15(a) had been satisfied violated their due process rights and the Administrative

Procedure Act.[7] According to the Towns, this case is not controlled by *Vermont Electric Power Co.* because it does not concern predetermined issues for post-compliance review but rather unanticipated events creating doubts about the viability of mitigation easements critical to the Board's conclusion that the Lowell project would not have an undue adverse impact on the natural environment. Thus, according to the Towns, at issue is more than a compliance filing, but rather the need for the Board to review its initial findings and conclusions regarding the required mitigation for the project's otherwise undue adverse impacts. In support of this argument, the Towns do little more than note the "recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Fla. E. Coast Ry.*, 410 U.S. 224, 241-42, 245 (1973) (concluding that by according parties opportunity "to file statements of positions, submissions of evidence," Interstate Commerce Commission satisfied statutory hearing requirement for its rate-making proceeding).

¶ 74. At the outset, we note the unusual context in which these arguments are made. Essentially, the Towns demanded that the Board revoke the CPG based on, among other things, its assertion that GMP had violated Condition 15(a) of the permit. As the Board noted, Condition 15(a) required GMP to comply with the MOU entered into between ANR and GMP, which, in relevant part, required GMP to obtain conservation easements on four identified parcels adjoining the proposed project to mitigate the project's impacts on wildlife habitat. The MOU could have gone further and specified that the mitigation parcels had to remain in the same condition from when the MOU was signed until the easements were obtained, but, for whatever reason, neither ANR

---

[7] We decline to address the Towns' cursory argument, raised for the first time on appeal, that the process afforded by the Board violated the Administrative Procedure Act. See *In re Vt. Yankee Nuclear Power Station*, 2003 VT 53, ¶ 13, 175 Vt. 368, 829 A.2d 1284 (declining to address claim that "was neither raised nor decided below"). We find unavailing the Towns' assertion that they preserved this claim of error below by complaining that GMP did not submit sworn affidavits and by arguing that it would be inappropriate for the Board to make a decision based on facts presented by only one side. Such general arguments are not the equivalent of asserting a specific statutory violation. *Id.* ("Contentions not raised or fairly presented below are not preserved for appeal.").

nor the Board imposed such a requirement. Moreover, nothing in the record suggests either that GMP was involved in or had notice of the landowner's unauthorized activities, and neither Condition 15(a) nor the MOU compelled GMP to police the parcels during that interim to assure that they remained undisturbed. Accordingly, no ground existed to find a violation of Condition 15(a), and the Board focused on nonrevocation remedies to remediate the damage to the mitigation parcels caused by the unauthorized activities. GMP cooperated fully with the process for finding an alternative source of mitigation, even though there was no requirement for it to extend such cooperation.

¶ 75. Given this context, the Board had more leeway with respect to the process accorded to the parties on the question of how to remediate the damage to the mitigation parcels. We agree with the Towns that the ANR attorney's letter to the Board summarizing an opinion by ANR's expert on the sufficiency of GMP's remediation efforts was hardly the "complete explanation from a qualified expert" requested of ANR. Normally, this type of a response would not be acceptable in a contested matter before the Board. But, in this context, the Board could consider the information presented in the letter to determine whether more process was due in the form of an evidentiary hearing. As explained below, the record does not provide a basis to disturb the Board's conclusion that the Towns failed to submit information demonstrating the need for an evidentiary hearing.

¶ 76. The Towns do not point to any specific statutory hearing requirement, but rather claim a constitutional procedural due process violation. "[D]ue process concerns arise whenever the state deprives an individual of an interest in the use of real or personal property." *Town of Randolph v. Estate of White*, 166 Vt. 280, 285, 693 A.2d 694, 697 (1997). "The presumption is that an individual is entitled to notice and an opportunity to be heard prior to deprivation of a property interest." *Hegarty v. Addison Cnty. Humane Soc'y*, 2004 VT 33, ¶ 18, 176 Vt. 405, 848 A.2d 1139. "Once such a deprivation is established, we must determine what process the complainant is due." *Id.*; see *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (stating that due process requires notice and opportunity to be heard "at a meaningful time and in a meaningful manner" (quotation omitted)).

¶ 77. Those claiming a violation of procedural due process in administrative proceedings, under either the federal or Vermont

constitutions, have the burden of showing such a violation by applying a three-part test that balances the various interests and risks involved. See *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (requiring balancing of (1) private interest affected by official action; (2) risk of erroneous deprivation of interest through procedures used, and probable value of additional procedures; and (3) government's interest, including function involved and fiscal and administrative burdens that additional procedural require- ments would entail); *Holton v. Dep't of Emp't & Training*, 2005 VT 42, ¶ 26, 178 Vt. 147, 878 A.2d 1051 (demonstrating deficiency in terms of procedural fairness of administrative procedures, as set forth in *Mathews v. Eldridge*, "is an element of . . . burden in showing a procedural due process violation"). In short, "the process due in a given administrative proceeding depends on the interest at stake." *In re Smith*, 169 Vt. 162, 171, 730 A.2d 605, 613 (1999).

¶ 78. Here, the Towns fail to make any such analysis. They make no attempt to address the *Eldridge* factors by balancing the various interests and risks involved. Rather, they merely cite case law supporting their contention that they were entitled to a hearing to cross-examine witnesses concerning disputed facts. Yet, most, if not all, of the facts appear to be undisputed. Indeed, there does not appear to be any dispute as to what clearing activities occurred on the easement parcels or what GMP did to remediate and offset those activities. The dispute, rather, is about whether GMP remained in compliance with Condition 15(a) given the tree clearing activities and GMP's response. The Board gave the parties, including the Towns, an opportunity to address that question in written comments. The Board also gave the parties, including the Towns, an opportunity to demonstrate that a tech- nical hearing was required to resolve that question. The Towns took advantage of the opportunity to comment and request a hearing but failed to convince the Board that a significant issue was raised by these facts, so as to require a technical hearing.

¶ 79. After reviewing the parties' comments, the Board deter- mined that GMP's remediation efforts were sufficient to restore the function intended for the easement parcels, and that the additional conservation easements obtained in mitigation in re- sponse to the unauthorized activities resulted in a greater degree of wildlife protection than anticipated or required by the CPG. Importantly, with respect to the Towns' due process claim, the

Board found that the Towns had failed to raise a significant issue that warranted a technical hearing because their expert who provided an opinion on the effects of the clearing activity was not qualified to do so. In short, the Board determined that, despite being given an opportunity to do so, the Towns failed to produce an expert opinion indicating that there was a significant question as to whether the function of the original easement parcels had been compromised. In addition, as discussed above, even if there had been such evidence, the Towns could not obtain the remedy they sought — revocation of the permit.

¶ 80. We conclude that the Towns have failed to meet their burden of demonstrating that the Board violated their constitutional right to due process by not holding an evidentiary hearing on whether GMP's efforts were sufficient to address the damage caused to the mitigation parcels. The Board informed the parties in advance of the process to be followed. The Towns concede that they were given an opportunity to comment and to request a technical hearing, but the Towns were unable to persuade the Board that a hearing was required. It would create substantial procedural expense for the parties and for the Board to hold a full-blown technical hearing every time there is a post-certification claim that any number of CPG conditions had not been complied with. The CPG in this case alone contained forty-five conditions, any one of which could have been the subject of a lack-of-compliance claim.

¶ 81. Moreover, as noted, this particular matter involved unusual circumstances in which a nonparty to the proceedings engaged in unauthorized activities that may have undermined the purpose behind one of the permit conditions but did not put the permittee, GMP, in breach of that condition. GMP nonetheless reported those activities, and the Board established a process that gave all of the parties an opportunity to comment on what needed to be done to ensure that the unauthorized activities had a minimal adverse impact. The process accorded to the parties by the Board under these circumstances was reasonable. Cf. *Vt. Elec. Power Co.*, 131 Vt. at 434-35, 306 A.2d at 692 (approving process whereby Board gave parties in post-certification proceeding opportunity to comment and convince Board that hearing was necessary for further review as to location of transmission lines).

¶ 82. The real question is whether the Board abused its discretion in denying a hearing in this instance, given the com-

ments it received from the parties. The Towns do not challenge the Board's finding that their expert was unqualified, which was the basis for the Board's conclusion that they failed to raise a significant issue warranting a technical hearing. Accordingly, we find no abuse of discretion in the Board's decision not to hold a hearing. Cf. *In re D.B.*, 161 Vt. 217, 222, 635 A.2d 1207, 1210 (1993) (holding that V.R.C.P. 78(b)(2), which gives trial courts discretion whether to hold hearings on written motions, provides trial courts with discretion to deny evidentiary hearings on post-trial motions).

¶ 83. Regarding the merits of the Board's ruling, the Towns argue that the Board erred in concluding that GMP's remediation and mitigation was sufficient to counter the otherwise undue adverse impacts to the natural environment posed by the project. According to the Towns, the Board's conclusion that GMP's remediation and mitigation actions were sufficient must be reversed because: (1) the Board specifically found during the CPG proceedings that the Lowell project would have undue adverse effects on the natural environment absent the mitigation set forth in the MOU; (2) GMP acknowledged, and the Board found, that the fragmentation (opening in the forest canopy) resulting from the tree cutting on the easement parcels will not be completely remedied for years; and (3) the supplemental mitigation resulting from GMP obtaining conservation easements on unconnected parcels does not address the fragmentation that occurred on the original easements.

¶ 84. We disagree with this logic and find no basis to overturn the Board's decision, given the deference we owe to the Board on such matters. As the Board explained, much of the clearing activity occurred within the access road corridor that was to be cleared anyway and the tree cutting did not result in the same degree of impact to habitat connectivity "or create the need for connectivity easements in the manner that project construction does." As noted, the Board also found that the "proposed supplemental mitigation and the increased restrictions on allowed uses of the Mitigation Parcels results in even greater protection of wildlife within the Lowell Mountain Habitat Block than what was contemplated by the Board's May 31 Order." As the Board explained, with the additional 172 acres in conservation easements, and the increased restrictions on the original mitigation easements, the fact that some relatively minor fragmentation (compared to that

resulting from the project) occurred on the easements obtained as part of the MOU does not mean that the four original easement parcels could no longer satisfy Condition 15(a) or mitigate the fragmentation concerns resulting from the project itself.

¶ 85. In response to the tree cutting on the easement parcels, consistent with ANR's § 1272 order, the Board required GMP to "ensure that parcels are remediated to a condition *as near as possible* to that which was contemplated during the technical hearing, *or failing that*, that appropriate supplemental mitigation is in place to offset any impacts to the mitigation parcels *that cannot be corrected in a timely fashion*." (Emphasis added.) In the end, the Board concluded that GMP remediated the tree cutting activities on the original easement parcels to the fullest extent possible, and further that the additional conservation easements obtained as supplemental mitigation — when combined with the original easements subject to additional restrictions — would provide a greater degree of wildlife protection than the original easements alone as contemplated under the MOU. The fact that the Board asked GMP to consider how the supplemental mitigation would address fragmentation on the easement parcels caused by the logging did not preclude the Board from determining, after considering the parties' comments, that GMP's remediation and mitigation actions with respect to the tree-cutting activities were sufficient to satisfy Condition 15(a) of the CPG.

¶ 86. The dissent would have this Court compel the Board to hold additional evidentiary hearings, even though the Board had taken voluminous testimony on issues related to the mitigation parcels, there was no dispute as to the material facts concerning the unauthorized work on those parcels, and the Towns were unable to produce any credible expert testimony raising serious doubts about the viability of the CPG or its Condition 15(a). We decline to disturb the Board's reasoned basis for denying the Towns' request for evidentiary hearings on this matter, given their failure to proffer any evidence warranting such hearings.

### B. Appeal of Board's October 3, 2011 Order Regarding Project's Economic Viability

¶ 87. Finally, the Towns argue that the Board erroneously concluded that: (1) it lacked jurisdiction to revoke the CPG while their appeal was pending; and (2) even if it had jurisdiction, it would deny the Towns' motion to revoke the CPG. In their August

2011 motion, the Towns claimed that GMP's failure to commence construction by August 1, 2011 meant that the CPG had to be revoked because the project was no longer economically viable due to the unavailability of the federal tax credits. In response, in its October 3, 2011 order, the Board ruled that: (1) it lacked jurisdiction to rule on the motion because the Towns were in effect seeking an amendment to determinations made in a Board decision that was already on appeal to this Court; and (2) assuming it had jurisdiction, it would deny the Towns' motion because the Board had not required commencement of construction by August 1, but rather had merely observed that construction would have to be commenced by that time for the proposed project to be in service by the end of 2012, after which time the federal tax credits might no longer be available.

¶ 88. We need not consider the Board's jurisdictional ruling insofar as we concur with the Board's alternative reason for denying the Towns' motion to revoke the CPG. As the Board indicated, it did not make the commencement of construction by August 1, 2011 a condition of the CPG. Rather, in effect, it found that construction would likely have to occur on that date for the project to be in service by the end of 2012, after which GMP would not be assured of obtaining the federal tax credits. Revocation of the CPG cannot be based on GMP's violation of a finding, as the Towns suggest.

¶ 89. Further, as the Board stated, it did not condition the CPG on GMP obtaining the tax credits, and thus obtaining the tax credits was never directly tied to the public good. Rather, the Board noted that the project, which benefitted the public, might be in danger if GMP were not allowed to move forward with construction and obtain the tax credits because the economic viability of the project for GMP would be less tenable. Accordingly, the Board did not err in denying the Towns' motion to revoke the CPG.

*Affirmed.*

¶ 90. **Zonay, Supr. J., Specially Assigned,** concurring in part and dissenting in part. I agree with Parts I and II(B) of the majority opinion. I also agree with the majority's conclusion in Part II(A) that the Towns have not established that the failure to hold a hearing on Condition 15(a) violated their constitutional right to due process. I am, however, unable to join the majority's

determination that the Public Service Board's denial of the hearing to address Condition 15(a) was a proper exercise of its discretion. Rather, I agree with the dissenting opinion of Board member Burke that a hearing was necessary. As such, I would remand the matter for a hearing on Condition 15(a) where the Towns would, at a minimum, be afforded an opportunity to cross-examine the Agency of Natural Resources (ANR) expert relied upon by the Board in issuing its order on August 31, 2011.

¶ 91. In issuing the certificate of public good (CPG) the Board, *after hearings*, recognized the potentially significant impacts the project could have and expressly conditioned its approval on the compliance of Green Mountain Power (GMP) with the Memorandum of Understanding (MOU) it had entered into with ANR. The MOU, among other things, required GMP to secure conservation easements on four identified parcels of land adjoining the project area. When unauthorized work was performed on the parcels, and modifications to Condition 15(a) were necessary, the Board, *without hearings*, modified the terms it previously found necessary. I cannot agree that the latter action was simply a compliance issue, and believe that the same process, i.e., a hearing, which led to the issuance of Condition 15(a) was necessary to modify the condition.

¶ 92. My view echoes that of Board member Burke, who dissented from the Board's decision on the basis that a hearing should have been held to allow the Towns an opportunity to cross-examine ANR's expert as to adequacy of the remediation. He further concluded that the Board's treatment of the issue as a compliance filing "push[ed] the limits of compliance too far" given that the "original decision has to be modified because of the drastic activities which occurred on the parcels to be conserved." Notably, his disagreement, and mine, lies with the process followed and does not address the ultimate issue as to whether the remediation efforts were adequate.

¶ 93. As to the actual process employed by the Board, when the unauthorized work was brought to its attention it issued a compliance order. In the order, the Board denied the Towns' requests to hold a technical hearing subject to discovery and cross-examination and required GMP to remediate and mitigate the impacts of the unauthorized work. Thereafter, following review of GMP's remediation report, and in response to ANR's letter, the Board requested that ANR file "a complete explanation from a qualified expert" concerning aspects of the remediation.

¶ 94. Significantly, despite the Board's explicit direction, ANR submitted, and the Board relied upon, a letter from ANR's counsel summarizing its expert's position. Although the majority here recognizes that "[n]ormally, this type of a response would not be acceptable in a contested matter before the Board," it approves the procedure on the basis that "the Board could consider the information presented in the letter to determine whether more process was due in the form of an evidentiary hearing." *Ante,* ¶ 75. Leaving aside the issue of the Board's acquiescence in ANR's clear violation of its directive, it cannot be overlooked that the Board did far more than use the information in deciding whether to hold a hearing when it relied on the unsworn representations of ANR's attorney as to what ANR's expert believed when it modified the condition at issue.

¶ 95. The Towns' repeated requests for an opportunity to cross-examine ANR's expert should have been granted. As to the importance of such an opportunity, it has been recognized that cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green,* 399 U.S. 149, 158 (1970) (quotation omitted). It is not surprising then, that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970).

¶ 96. Although I agree with the majority that the Towns have failed to establish a violation of due process, I cannot escape the conclusion that the underlying reasons for requiring an opportunity for cross-examination where "important decisions turn on questions of fact" applies with such force here that, in denying the Towns such an opportunity, the Board abused its discretion. Nor does it follow, as the majority suggests, that simply because the Board did not credit the views of the Towns' expert, the views of ANR's expert were therefore correct. This is precisely why the Towns should have been afforded an opportunity to cross-examine ANR's expert on his opinions.

¶ 97. In addressing the hearing request, the Board concluded that it was dealing with a post-certification compliance issue that does not require the same level of process as the initial proceedings. The majority concurs in this rationale. This was not, however, a simple case of assuring compliance with a condition; from the time the unauthorized work was identified by GMP,

there was no question that to address the issue would require modifying a condition the Board had already found, after hearing, to be necessary to address potentially significant impacts.

¶ 98. While I agree with the majority that a post-certification compliance issue does not require the same level of process, the issues addressed by the Board here went well beyond the type of post-certification compliance proceedings generally deemed adequate by this Court. See, e.g., *In re UPC Vt. Wind, LLC*, 2009 VT 19, ¶ 10, 185 Vt. 296, 969 A.2d 144 ("The Board acted within its discretion in using post-certification proceedings to evaluate UPC's compliance with the conditions imposed."); *In re Vt. Elec. Power Co.*, 131 Vt. 427, 434-35, 306 A.2d 687, 692 (1973) (approving process whereby Board gave parties in post-certification proceeding opportunity to comment and convince Board that hearing was necessary for further review as to specific route of transmission lines where Board had already approved general route for proposed line). This was not a case of monitoring *compliance* with a condition, but rather a case of *changing* a noncomplying condition.

¶ 99. More than fifty years ago, this Court addressed the issue of an abuse of discretion by the as-then-named Public Service Commission in *In re New England Tel. & Tel. Co.*, 116 Vt. 480, 80 A.2d 671 (1951). There, the Commission made findings for a rate increase based upon estimates because the actual operating expenses were not yet available at the time of the hearings. After the Commission made its findings, the telephone company moved to reopen the hearing in order to submit the actual operating expenses for the last fiscal year, which expenses differed widely from the estimates relied upon. The Commission denied the motion to reopen the hearing, and the phone company appealed. *Id.* at 508-09, 80 A.2d at 688-89.

¶ 100. In finding the Commission's denial to be an abuse of discretion, this Court wrote:

> Although the allowance of such a motion is discretionary, we think that its disallowance here constituted an abuse of discretion. It would not have taken long to hear the new evidence, and in view of the wide discrepancy between the commission's estimates and the actual experience, the commission should have gone to the trouble to hear the company's evidence and the State's evidence in reply thereto. Had it done so, it could have determined

just what the lawful expenses actually were, and have based its findings upon facts rather than estimates.

*Id.* at 515, 80 A.2d at 692.

¶ 101. The majority, in my view, fails to follow the holding in *New England Telephone.* Now, just as more than a half-century ago, it would not have taken long for the Board to allow the Towns an opportunity to cross-examine ANR's expert. Given the significance of the condition being changed, the Board plainly should have gone to the trouble of allowing the Towns to cross-examine ANR's expert. This is especially true where the condition was originally implemented through such a process, and later changed based on unsworn statements by a party's attorney as to what the expert would say.

¶ 102. Finally, I do not agree with the majority that requiring a hearing in this case would have the effect of requiring a full-blown technical hearing every time there is a post-certification claim that a condition has not been complied with. *Ante,* ¶ 80. Rather, the specific facts at issue, including the critical nature of Condition 15(a) concerning possible "undue impact," the unauthorized work done that affected this condition, and the evidentiary basis for the Board's finding make the decision here a case-specific one requiring more process than was provided.

¶ 103. I am authorized to state that Judge Eaton joins this dissent.